GARY L. PELLOM, PLAINTIFF v. BEVERLEY M. PELLOM, DEFENDANT

No. COA08-113

(Filed 2 December 2008)

1. **Divorce— equitable distribution—valuation—marital property—business ownership interest—date of separation**

The trial court did not abuse its discretion in an equitable distribution case by using a defense expert's valuation regarding plaintiff husband's normalized income in calculating the value of his ownership interest in Durham Anesthesia Associates (DAA) because: (1) in valuing a marital interest in a business, the task of the trial court is to arrive at a date of separation value which reasonably approximates the net value of the business interest, and the defense expert properly valued the business at the date of separation with the data he had at the time; (2) the fact that the defense expert's projection did not prove completely accurate between the time of the report and the time of trial was not sufficient reason to find an abuse of discretion by the trial court in accepting the expert's opinion; and (3) the trial court's findings of fact regarding plaintiff husband's normalized income were based on competent evidence presented by the defense expert.

**2. Divorce— equitable distribution—distributive award—calculation of income**

The trial court did not abuse its discretion in an equitable distribution case by utilizing a defense expert's income figure for a similarly situated anesthesiologist to calculate plaintiff husband's income for the distributive award because: (1) even if it would have been better practice to use a more recent version, accepting figures based on the 2003 report of the Medical Group Management Association physician compensation data for anesthesiologists does not rise to an abuse of discretion; (2) there was no ascertainable math error; (3) the trial court was not required to accept the analysis of plaintiff's expert since it determined that the statistics relied on were not appropriate under the facts of this case; and (4) the $275,000 figure was based on competent evidence.

**3. Divorce— equitable distribution—future earning capacity**

The trial court did not abuse its discretion in an equitable distribution case by accepting a defense expert's assumption that plaintiff will continue to work for Durham Anesthesia Associates (DAA) until he reaches the age of 60 even though plaintiff contends the method of valuing DAA was calculated using post-date of separation (D.O.S.) active efforts because: (1) there was no evidence that the expert used any information concerning plaintiff's post-D.O.S. earnings; (2) the expert was taking into account future earning capacity in order to properly value plaintiff's current interest; and (3) the expert needed a limitation on the future earnings figure, and plaintiff's retirement from DAA served that purpose.

**4. Divorce— equitable distribution—marital property valuation—tax consequences**

The trial court did not abuse its discretion in an equitable distribution case by allegedly failing to consider the tax consequences when accepting defense expert's valuation regarding the parties' ownership interest of Durham Anesthesia Associates (DAA) because: (1) the trial court complied with N.C.G.S. § 50-20(c)(11) by ordering plaintiff to pay a distributive award rather than liquidate his interest in DAA, which may have had a significant tax consequence; and (2) the defense expert was correct in not taking into account personal taxes that plaintiff had to pay on his income, but did consider DAA's entity taxes by evalu-

ating the capitalization rate of DAA and finding that the company paid little to no taxes since it typically disbursed all of its profits each year.

**5. Divorce— equitable distribution—marital property valuation—failure to take into account goodwill or accounts receivable**

The trial court did not abuse its discretion in an equitable distribution case by refusing to accept plaintiff's Durham Anesthesia Associates (DAA) valuation of $183,000 based on his expert's failure to account for the goodwill value or accounts receivable of DAA. The trial court is not bound to follow any particular methodology in determining DAA's present value, and the findings of fact regarding value are conclusive in appellate review of a bench equitable distribution trial if there is evidence to support them even if there is also evidence supporting a contrary finding.

**6. Divorce— equitable distribution—marital property—in-kind distribution**

The trial court did not abuse its discretion in an equitable distribution case by not ordering an in-kind distribution of the parties' 25% interest in Fitness Docs and by allocating the stock in Fitness Docs to plaintiff and requiring him to pay a distributive award because: (1) defendant wife rebutted the presumption of in-kind distribution through evidence that Fitness Docs is a closely-held corporation owned by defendant, plaintiff, and three other physicians who are partners with plaintiff in Durham Anesthesia Associates; (2) defendant would have no way of dealing with the issues that would arise with the company since she was estranged from the other owners; and (3) the nature of the business and plaintiff's relationship with the other doctors revealed that plaintiff was in a much stronger position to benefit from the Fitness Docs investment.

**7. Divorce— equitable distribution—findings of fact—ability to pay distributive award**

The trial court did not abuse its discretion in an equitable distribution case by failing to make any findings regarding plaintiff's ability to pay a distributive award because: (1) plaintiff did not allege that he would have to liquidate assets or obtain a loan to pay the award; (2) the court made findings regarding plaintiff's substantial income which was a liquid asset he could use to pay the award; (3) plaintiff maintained half of the parties' joint sav-

ings account of $60,604.82; (4) the court did not order plaintiff to liquidate any assets, and plaintiff was given more than ten years to pay the award per his request that it be made payable over time; (5) defendant had additional resources of liquid assets besides his monthly paycheck including savings, stock distributions, and DAA bonuses, and he was allowed to pay the majority of the award over time; and (6) if a party's ability to pay an award with liquid assets can be ascertained from the record, then the distributive award must be affirmed.

**8. Divorce— equitable distribution—premarital and third-party contributions**

The trial court did not improperly consider premarital and third-party contributions to support its equitable distribution award because, although the trial court made findings that defendant's parents assisted the couple with gas money, furniture, groceries, and the like in the early years of their marriage, there was no indication that the court placed a value on these activities for the purpose of forming the distributive award or in determining that an unequal distribution was justified.

**9. Divorce— equitable distribution—unequal distribution— present day dollar for dollar reimbursement for retirement account—support of family unit instead of out-of-pocket direct contribution to spouse's education**

The trial court abused its discretion in an equitable distribution case by giving a present day dollar for dollar reimbursement of $65,125.21 for defendant wife's retirement account which she cashed out approximately twenty years prior to the date of separation and used to support the family while plaintiff husband was in medical school, and the case is remanded since the 54% unequal distribution was based in large part on this reimbursement, because: (1) although the trial court made proper findings under N.C.G.S. § 50-20(c)(7) as to why defendant was entitled to an unequal distribution according to the various statutory factors including defendant's contributions to plaintiff's education, defendant also obtained a substantial benefit; (2) although direct out-of-pocket expenses of a non-student spouse in support of a student spouse's education should be considered by the trial court when dividing marital property and ordering a reimbursement of those expenses, the facts of this case revealed that defendant's retirement earnings were used to support the family unit instead of an out-of-pocket direct contribution to plaintiff's

**PELLOM v. PELLOM**

[194 N.C. App. 57 (2008)]

education that would warrant a present day dollar for dollar reimbursement; and (3) defendant reaped the benefits of withdrawing the account both while plaintiff was in school, as she was able to stay home with the parties' daughter, as well as after plaintiff obtained his degree.

Appeal by plaintiff from a judgment entered 12 December 2006 by Judge Ann E. McKown in Durham County District Court. Heard in the Court of Appeals 25 August 2008.

*Burton & Ellis, PLLC, by Alyscia G. Ellis, for plaintiff-appellant.*

*Lewis, Anderson, Phillips & Hinkle, PLLC, by Susan H. Lewis and Beth P. Von Hagen, for defendant-appellee.*

HUNTER, Judge.

Gary L. Pellom ("plaintiff") and Beverley M. Pellom ("defendant") were married on 30 December 1972 and physically separated on 9 June 2004. A complaint for equitable distribution, *inter alia*, was filed on 7 February 2005. The parties divorced on 1 September 2005. An equitable distribution judgment was entered 12 December 2006 in Durham County District Court. The court held that defendant was entitled to 54% of the couple's net assets and ordered plaintiff to pay a distributive award in the amount of $839,964.32. Plaintiff appeals from the judgment. After careful review, we vacate in part, affirm in part, and remand for further proceeding.

On appeal, the two property interests in dispute are plaintiff's 11.11% ownership interest in Durham Anesthesia Associates, P.A. ("DAA"), and the parties' 25% ownership interest in Fitness Docs, Inc. ("Fitness Docs"). Plaintiff's expert valued DAA at $183,000.00, while defendant's expert valued the business at $1,267,000.00. The trial court accepted the valuation proposed by defendant's expert. There is no dispute as to the value of Fitness Docs.

All assignments of error in the case relate to equitable distribution of property; therefore, the standard of review is abuse of discretion. Our State Supreme Court has held:

It is well established that where matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion. A trial court may be reversed for abuse of discretion only upon a

showing that its actions are manifestly unsupported by rea-
son. A ruling committed to a trial court's discretion is to be
accorded great deference and will be upset only upon a show-
ing that it was so arbitrary that it could not have been the result
of a reasoned decision.

*White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) (internal
citations omitted).

In conformity with the standard of review, this Court will not
"second-guess values of marital . . . property where there is evi-
dence to support the trial court's figures." *Mishler v. Mishler*, 90 N.C.
App. 72, 74, 367 S.E.2d 385, 386, *disc. review denied*, 323 N.C. 174,
373 S.E.2d 111 (1988). We will now address plaintiff's multiple argu-
ments in turn.

A.

[1] Plaintiff first argues that the trial court erred in using the defense
expert's valuation of DAA as the method was not sound nor properly
applied to the facts at issue. Specifically, plaintiff alleges that in his
use of the income approach, discounted cash flow method, defend-
ant's expert, Mr. Pulliam, used an incorrect figure for the " 'normal-
ized' income" of plaintiff. This figure is relevant since it is compared
to similarly situated physicians to calculate the value of plaintiff's
interest in DAA. "The accuracy of [the income] approach depends sig-
nificantly upon the accuracy of the 'average' statistics used in the
comparison." *Carlson v. Carlson*, 127 N.C. App. 87, 93, 487 S.E.2d
784, 787 (1997) (citation omitted).

Mr. Pulliam used a figure of $525,000.00 as plaintiff's " 'normal-
ized' income," which plaintiff claims was improperly based on his
2003 income alone—the highest salary he received between 1999 and
2005. The record shows that plaintiff's income was steadily rising
between 1999 and 2003.[1] Plaintiff is correct in stating that Mr.
Pulliam's report does not take into account plaintiff's 2004 and
2005[2] earnings. Mr. Pulliam's report is "[a]s of June 9, 2004," the date
the parties separated. This Court has held, " '[i]n valuing a marital
interest in a business, the task of the trial court is to arrive at a *date
of separation* value which "reasonably approximates" the net value
of the business interest.' " *Fitzgerald v. Fitzgerald*, 161 N.C. App.

---

1. Plaintiff earned $326,935.00 in 1999, $365,598.00 in 2000, $348,443.00 in 2001,
$465,958.00 in 2002, and $528,155.00 in 2003.

2. $508,252.00 and $422,815.00 respectively.

414, 419, 588 S.E.2d 517, 521 (2003) (citations omitted; emphasis added). Mr. Pulliam properly valued the business at the date of separation with the data he had at the time.

The trial court addressed plaintiff's allegation in the judgment. The court found that "Mr. Pulliam based his projection on the best information he had at the time he prepared his report." The fact that Mr. Pulliam's projection did not prove completely accurate between the time of the report and the time of trial is not sufficient reason to find an abuse of discretion by the trial court in accepting the expert's opinion.

Upon reviewing the record, we find the trial court's findings of fact regarding plaintiff's "normalized income" were based on competent evidence presented by Mr. Pulliam. Therefore, we find no error as to this portion of the valuation.

B.

[2] Plaintiff also argues that Mr. Pulliam's income figure for a "similarly situated anesthesiolgist [sic]" was incorrectly calculated and the trial court abused its discretion in utilizing it to form the distributive award. The figure accepted by the trial court was $275,000.00, putting plaintiff in the 75th percentile in compensation.

Plaintiff asserts that Mr. Pulliam was not justified in relying on the 2003 version of the Medical Group Management Association ("MGMA") physician compensation data for anesthesiologists since the 2004 version was available at the time of his report, but he does not claim that the 2004 version would have changed the outcome. In fact, the report shows that Mr. Pulliam made a note that the "2004 MGMA corroborates with 73%." Even if it would have been better practice to use a more recent version, accepting figures based on the 2003 report does not rise to an abuse of discretion on the part of the trial court.

Plaintiff further argues that there was a simple math error such that 84% rather than 70% should have been used as the percentage representing compensation for production. The testimony that is quoted in plaintiff's brief is taken out of context. Mr. Pulliam did say at trial that he divided thirty-seven weeks (the number of weeks plaintiff would work if he took all fifteen weeks of vacation allotted to him) by forty-four weeks (the number of weeks the 50th percentile anesthesiologists work). When the questioning attorney called his

attention to the fact that the result is .84, not .70, he stated that he thought those were the right numbers, but that he was unsure and would have to check his report.

In fact, the report shows that Mr. Pulliam placed plaintiff in the 75th percentile in compensation. He then took multiple factors into account, such as clinical hours worked and retirement benefits, and calculated $394,000.00. He then multiplied $394,000.00 by .70 since .70 is between the estimated portion of compensation in MGMA attributable to a compensation range of 60% to 80%. The result is $275,800.00, which was rounded down to $275,000.00. There was no math error that we can ascertain.

Plaintiff also argues that Mr. Pulliam, like Mr. Strange, should have placed plaintiff in the 90th percentile of compensation, instead of the 75th percentile, based on the number of procedures performed by DAA and the corresponding MGMA statistics. As the trial court notes, the MGMA data shows that nationwide the 75th percentile physicians performed an average of 1,153 procedures per year, and the 90th percentile performed 1,400 per year. DAA performed approximately 20,000 procedures per year, or 2,000 per physician. The trial court found that the MGMA, and Mr. Strange, did not take into account how many of these procedures were actually performed by certified registered nurse anesthetists ("CRNAs"). The MGMA does not account for this factor because under the laws of most states, CRNAs are not allowed to perform these procedures. In fact DAA had thirty-one CRNAs, as compared to eleven physicians, performing procedures that were attributed to the practice's overall performance figure of 20,000. The trial court did not err in refusing to accept Mr. Strange's analysis as it determined that the statistics Mr. Strange relied on were not appropriate under the facts of this case.

We find that $275,000.00 as the figure used for a "similarly situated anesthesiolgist [sic]" was based on competent evidence and there was no abuse of discretion on the part of the trial court.

C.

[3] Next, plaintiff argues that the method of valuing DAA was calculated using post-date of separation active efforts. This argument is without merit as the trial court properly notes that Mr. Pulliam "based his valuation on a projection of Dr. Pellom's future income based on his past income . . . . There is no evidence that Mr. Pulliam used any information concerning Dr. Pellom's post-D.O.S. [date of separation] earnings . . . ." This Court has found it proper to value a business at

"the price which an outside buyer would pay for it taking into account its future earning capacity[.]" *Poore v. Poore*, 75 N.C. App. 414, 420, 331 S.E.2d 266, 270, *disc. review denied*, 314 N.C. 543, 335 S.E.2d 316 (1985). Mr. Pulliam was taking into account future earning capacity in order to properly value plaintiff's current interest.

Plaintiff takes issue with Mr. Pulliam's assumption that plaintiff will continue to work for DAA until he reaches the age of sixty, however, in determining the value of plaintiff's interest in DAA, Mr. Pulliam needed a limitation on the future earnings figure and plaintiff's retirement from DAA served that purpose. The trial court did not abuse its discretion in accepting that explanation as it is based on a reasoned approach to valuing a business.

### D.

**[4]** Plaintiff's final argument with regard to the valuation of DAA is that the trial court abused its discretion because it failed to consider the tax consequences when accepting Mr. Pulliam's valuation.

Plaintiff claims that Mr. Pulliam used plaintiff's gross personal income to value the business interest, which is subject to income taxation, and did not account for the tax consequences. The trial court addressed this issue in finding of fact five where it acknowledged that "Mr. Strange and Mr. Pulliam agreed that personal income taxes are not ever to be considered in any valuation method . . . ." Mr. Pulliam did not consider personal income taxes, but he did consider entity-level tax consequences in his valuation of DAA by using the Ibbotson Build-Up Method to determine the appropriate capitalization rate. The trial court notes that Mr. Pulliam's capitalization rate was within one percentage point of plaintiff's expert, Mr. Strange.

Pursuant to statute, a trial judge shall consider in an equitable distribution matter:

> The tax consequences to each party, including those federal and State tax consequences that would have been incurred if the marital and divisible property had been sold or liquidated on the date of valuation. The trial court may, however, in its discretion, consider whether or when such tax consequences are reasonably likely to occur in determining the equitable value deemed appropriate for this factor.

N.C. Gen. Stat. § 50-20(c)(11) (2007).

In applying the above statute, this Court has held:

The trial court is not required to consider possible taxes when determining the *value* of property in the absence of proof that a taxable event has occurred during the marriage or *will* occur with the division of the marital property. We construe Section 50-20(c)(11) of the General Statutes as requiring the court to consider tax consequences that will result from the distribution of property that the court actually orders.

*Weaver v. Weaver,* 72 N.C. App. 409, 416, 324 S.E.2d 915, 920 (1985) (internal citations omitted), *disapproved on other grounds by Armstrong v. Armstrong,* 322 N.C. 396, 403-04, 368 S.E.2d 595, 599 (1988).

The trial court complied with the statute by considering the tax consequences to plaintiff. However, plaintiff was ordered to pay a distributive award, not liquidate his interest in DAA, which may have had a significant tax consequence. Furthermore, Mr. Pulliam was correct in not taking into account personal taxes that plaintiff had to pay on his income, but he did consider DAA's entity taxes by evaluating the capitalization rate of DAA and finding that the company paid little to no taxes because it typically disbursed all of its profits every year. Accordingly, we find no abuse of discretion with regard to this assignment of error.

E.

[5] It should be noted that the trial court refused to accept plaintiff's DAA valuation of $183,000.00 as his expert, Mr. Strange, did not account for the goodwill value or accounts receivable of DAA. There is a large discrepancy in the two experts' findings, and the trial judge felt that DAA had a goodwill value and that Mr. Pulliam's report properly accounted for such using the discounted cash flow method. The trial judge was not bound to follow any particular methodology in determining DAA's present value. *Poore,* 75 N.C. App. at 421, 331 S.E.2d at 271 ("[a]ny legitimate method of valuation that measures the present value of goodwill by taking into account past results . . . is a proper method of valuing goodwill"). Furthermore, "[o]n appeal, if it appears that the trial court reasonably approximated the net value of the practice *and its goodwill,* if any, based on competent evidence and on a sound valuation method or methods, the valuation will not be disturbed." *Id.* at 422, 331 S.E.2d at 272 (emphasis added).

The trial judge, in his or her discretion, must weigh the various experts' opinions and determine which valuation is sound. "In appel-

late review of a bench equitable distribution trial, the findings of fact regarding value are conclusive if there is evidence to support them, even if there is also evidence supporting a finding otherwise." *Crutchfield v. Crutchfield*, 132 N.C. App. 193, 197, 511 S.E.2d 31, 34 (1999) (citation omitted). In the present case the trial court's findings of fact detail Mr. Pulliam's analysis of DAA's goodwill value and why the court chose to accept his valuation as opposed to that of plaintiff's expert. After reviewing plaintiff's multiple arguments against the accepted valuation of DAA, we find that the trial court did not abuse its discretion in finding that plaintiff's 11.11% interest in DAA was worth $1,267,000.00 at the date of separation.

II.

[6] Next, plaintiff contends that the trial court committed reversible error in not ordering an in-kind distribution of the parties' 25% interest in Fitness Docs. We disagree. N.C. Gen. Stat. § 50-20(e) states in pertinent part:

> [I]t shall be presumed in every action that an in-kind distribution of marital or divisible property is equitable. This presumption may be rebutted by the greater weight of the evidence, or by evidence that the property is a closely held business entity or is otherwise not susceptible of division in-kind. In any action in which the presumption is rebutted, the court in lieu of in-kind distribution shall provide for a distributive award in order to achieve equity between the parties.

Here, defendant rebutted the presumption of in-kind distribution through evidence that Fitness Docs is a closely held corporation as it is owned by defendant, plaintiff, and three other physicians who are partners with plaintiff in DAA. The court noted in its findings of fact, which were based on defendant's testimony, that defendant would have no way of dealing with the issues that would arise with the company and that she was estranged from the other owners. The court also determined that due to the nature of the business and plaintiff's relationship with the other doctors, "[p]laintiff is in a much stronger position to benefit from the Fitness Docs investment."

Since plaintiff rebutted the presumption of in-kind distribution with regard to the 25% interest in Fitness Docs, we find that the trial court did not abuse its discretion in allocating the stock to plaintiff and requiring him to pay $175,000.00 as a distributive award.

III.

**[7]** Plaintiff also argues that the trial court erred by not making any findings regarding plaintiff's ability to pay a distributive award. We disagree.

The trial court ordered plaintiff to pay a distributive award with an initial payment of $200,000.00 on 1 January 2007 followed by equal quarterly payments of $15,999.11 from 1 January 2008 through 1 October 2017, plus interest at the legal rate.

Plaintiff cites *Embler v. Embler*, 159 N.C. App. 186, 582 S.E.2d 628 (2003), to support his position that the trial court must consider a spouse's ability to pay a distributive award. In *Embler*, the defendant claimed that he had "no liquid assets from which to pay [the $24,876.00] award . . . ." *Id.* at 187, 582 S.E.2d at 630. The Court found that "[i]f defendant is ordered to pay the distributive award *from a non-liquid asset or by obtaining a loan*, the equitable distribution award must be recalculated to take into account any adverse financial ramifications such as adverse tax consequences." *Id.* at 188-89, 582 S.E.2d at 630 (emphasis added). There, "defendant's evidence [was] sufficient to raise the question of where defendant [would] obtain the funds to fulfill this obligation." *Id.* at 188, 582 S.E.2d at 630.

Unlike in *Embler*, plaintiff in the case at bar did not argue to the trial court, or on appeal, that he would have to liquidate assets or obtain a loan to pay the award. The court made findings regarding plaintiff's substantial income,[3] which is an obvious liquid asset from which he could pay the award. Furthermore, plaintiff maintained half of the parties' joint savings account, a total of $60,604.82. Moreover, the court did not order plaintiff to liquidate any assets, and plaintiff was given more than ten years to pay the award per his request that it be made payable over time.

Plaintiff also cites *Robertson v. Robertson*, 167 N.C. App. 567, 605 S.E.2d 667 (2004), where this Court found that the trial court did not make sufficient findings as to the defendant's ability to pay

3. Plaintiff earned over $508,253.00 in 2004 (the year of separation) and $422,815.00 in 2005. According to the trial court's distribution statement, he was to keep in his possession a post-separation distribution from Fitness Docs in the amount of $52,650.00 (classified as divisible property) and $77,000.00 from an accrued DAA bonus (classified as marital property though distributed after the date of separation). Plaintiff generally received quarterly bonuses from DAA in amounts as high as $95,000.00.

a $52,100.07 distributive award. *Id.* at 571, 605 S.E.2d at 669. In that case, the trial court made a specific finding that the defendant could liquidate assets to pay a distributive award, but did not account for any financial ramifications to the defendant in formulating the award. *Id.* at 571, 605 S.E.2d at 669-70. There, the defendant only had $5,929.38 in two checking accounts, and he was being required to pay the *full award* in ninety days. *Id.* at 569-71, 605 S.E.2d at 669. This Court found the trial court erred in considering the defendant's income, which comprised his sole source of liquid assets, without taking into account his liabilities. *Id.* at 571, 605 S.E.2d at 670. Here, defendant had additional sources of liquid assets besides his monthly paycheck, such as savings, stock distributions, and DAA bonuses. Furthermore, he was allowed to pay the majority of the award over time.

In reviewing the case law, we find that if a party's ability to pay an award with liquid assets can be ascertained from the record, then the distributive award must be affirmed. *See Allen v. Allen,* 168 N.C. App. 368, 376-77, 607 S.E.2d 331, 336-37 (2005) (distributive award was affirmed where findings of fact indicated that the defendant could pay the award from his business and rental income and proceeds from refinancing his house). Conversely, as seen in *Robertson* and *Embler,* if a question is raised as to the ability of the payor spouse to pay the award with liquid assets, then the trial court must make findings regarding the spouse's liquid and non-liquid assets and adjust the award for any financial ramifications.

Thus, we find the trial court did not abuse its discretion in its distributive award order where plaintiff had obvious liquid assets from which to pay the award and he was allowed to do so on a reasonable payment schedule per his request.

### IV.

[8] Plaintiff next argues that the court improperly considered premarital and third party contributions to support its equitable distribution award. This argument is without merit.

While plaintiff does not point to any specific finding of the trial court to support this argument, in reviewing the judgment we see that the court made findings that defendant's parents assisted the couple with gas money, furniture, groceries, and the like in the early years of their marriage, but there is no indication that the court placed a value on these activities for the purpose of forming the distributive award

or in determining that unequal distribution was justified. Similarly, the court found that both parties worked after their engagement, but prior to marriage, in order to save money. Again, the court does not place any value on these contributions and does not cite these findings in its conclusion that defendant should receive an unequal share of the assets. In sum, there is no evidence that the court abused its discretion by considering inappropriate facts with regard to premarital or third party contributions.

V.

[9] Plaintiff's last argument is that the court abused its discretion by giving a present-day dollar for dollar reimbursement for defendant's retirement account, which she cashed out approximately twenty years prior to the date of separation and used to support the family while plaintiff was in medical school, thus assisting him in obtaining his medical degree. This reimbursement of $65,125.21, coupled with an undisputed additional $24,487.00, meant that defendant was to receive a total of 54% of the net assets.

Plaintiff contends that a dollar for dollar reimbursement was inappropriate because defendant benefitted from the money she withdrew as her support of plaintiff's education resulted in his higher salary, and allowed defendant the option to forego employment during a significant part of the marriage. Defendant asserts that had she left the money in the State retirement system, instead of using it to support plaintiff's education, she would now be guaranteed a monthly lifetime annuity and health care benefits. Upon review, we agree with plaintiff.

During the first five years of marriage, defendant earned an undergraduate and a graduate degree in speech pathology. She then began working full-time for the state school system and accrued retirement benefits for approximately five years. Defendant withdrew her retirement account once the parties conceived their daughter and jointly decided that defendant would no longer work. Defendant did in fact work part-time once the parties' daughter began pre-school, but she never again worked a full-time job. Approximately twenty years passed between defendant's withdrawal of the retirement account and the parties' separation, during which defendant benefitted financially from the medical degree she helped plaintiff earn. Furthermore, under the equitable distribution judgment, defendant was awarded half of plaintiff's substantial retirement account, which he earned because of his medical degree. Defendant also received

half of plaintiff's interest in his medical practice and all other assets acquired during the marriage.

According to N.C. Gen. Stat. § 50-20(c)(7), in determining an unequal division of marital property, the court must consider, "[a]ny direct or indirect contribution made by one spouse to help educate or develop the career potential of the other spouse." *Id.* "The trial court is required to consider evidence of such contributions . . . [, but t]here is no language within § [50-20](c) which would indicate that the trial court is required to place a monetary value on any distributional factor . . . ." *Gum v. Gum,* 107 N.C. App. 734, 739, 421 S.E.2d 788, 791 (1992). The value to be awarded is within the discretion of the trial court, but the decision must be reasoned. *See White v. White,* 312 N.C. at 777, 324 S.E.2d at 833. We determine that the judge properly made findings as to why defendant was entitled to an unequal distribution according to the various statutory factors, including defendant's contributions to plaintiff's education, but we find there was an abuse of discretion in giving defendant a full reimbursement for marital property she used to support the family unit and for which she also obtained a substantial benefit.

There is not a breadth of case law available on this topic. However, with regard to one spouse's support of the other's education, the case of *Geer v. Geer,* 84 N.C. App. 471, 353 S.E.2d 427 (1987), is informative. In *Geer,* the trial court awarded defendant-husband a reimbursement of his direct out-of-pocket contributions to plaintiff-wife's medical school education, but failed to recognize plaintiff's contribution to her own education by withdrawing her retirement account to pay expenses.[4] *Id.* at 479-80, 353 S.E.2d at 431-32.

We find *Geer* to stand for the proposition that direct out-of-pocket expenses of a non-student spouse in support of a student spouse's education should be considered by the trial court when dividing marital property and ordering a reimbursement of those expenses is not an abuse of discretion.

The major distinguishing factor between *Geer* and the present case is that in *Geer* the defendant alleged he received no benefit from his wife's medical degree. *Id.* at 478, 353 S.E.2d at 431. The Court recognized that "[b]ecause the parties separated shortly before plaintiff completed her medical training, defendant was prevented from realizing any of the expected benefits to the marriage of the joint decision

---

4. Plaintiff in this case does not argue that the trial court failed to recognize his contributions to his own education.

**PELLOM v. PELLOM**

[194 N.C. App. 57 (2008)]

that plaintiff pursue a medical degree with defendant's financial, child care, and homemaking support." *Id.* In contrast, this is not so in the case before us. Here, it is undisputed that defendant benefitted from her contributions to plaintiff's education during the remaining twenty years of their marriage. Due in large part to the retirement account funds, defendant was able to cease working full-time, she had financial security for many years after plaintiff finished medical school due to his advanced degree and increased earning capacity, and she received distribution of half of plaintiff's retirement account and his interest in DAA. Defendant continues to benefit from plaintiff's income through a substantial alimony award.

Based on the facts in the case *sub judice,* we determine that defendant's retirement earnings were used to support the family unit and cannot be classified as an out-of-pocket direct contribution to plaintiff's education that would warrant a present-day dollar for dollar reimbursement. Again, the trial court was correct in acknowledging multiple statutory factors that would justify an unequal distribution of property, including defendant's contributions to plaintiff's education, but the court abused its discretion in awarding defendant a $65,125.21 reimbursement specifically for the cashed in retirement account. Because defendant reaped the benefits of withdrawing the account both while plaintiff was in school, as she was able to stay home with the parties' daughter, as well as after he obtained his degree, she should not be reimbursed 100% of her retirement fund. Since the 54% unequal distribution was due in large part to the $65,125.21, we must remand.

Thus, for the foregoing reasons, we affirm in part, vacate in part, and remand for further proceedings not inconsistent with this opinion.

Affirmed in part, vacated in part, and remanded.

Chief Judge MARTIN and Judge WYNN concur.