IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-759

Filed 6 May 2026

New Hanover County, No. 19CVD000301-640

KATHERINE JANE MACDONALD, Plaintiff,

v.

BRYCE INGLIS MACDONALD, Defendant/Third-Party Plaintiff,

v.

MCKENZIE CRONK, LLC, and DENISON CRONK, LLC, Third-Party Defendants.

Appeal by plaintiff from order entered 12 January 2024 by Judge Melinda H. Crouch in District Court, New Hanover County. Heard in the Court of Appeals 22 April 2025.

*Mark Hayes for plaintiff-appellant.*

*Bryce MacDonald, pro se, defendant-appellee.*

*No brief filed for third-party defendants.*

STROUD, Judge.

Plaintiff Katherine MacDonald (Wife) appeals the trial court's order granting equitable distribution, imposing sanctions against her, and awarding child support

to Defendant Bryce MacDonald (Husband). We affirm the equitable distribution judgment and sanctions award. On child support, however, we partially vacate the finding about Husband's gross income and remand for entry of a new child support order.

## I. Background

Husband and Wife married on 14 December 2000 and separated on 31 July 2017. Three children were born during the marriage.[1]

Wife filed a complaint for equitable distribution, alimony, postseparation support, and attorney's fees against Husband on 25 January 2019. Husband answered on 6 March 2019 but filed no counterclaims at that time. On 26 March 2019, he filed an Answer to Amended Complaint[2] with counterclaims for child custody; child support, both prospective and retroactive from the date of separation "to the filing of [his] counterclaims"; attorney's fees; equitable distribution, including a request for an unequal distribution; interim equitable distribution; a temporary

---

[1] The trial court found that the parties' two eldest children "reached the age of majority and graduated from high school" in June 2019, and the youngest child "reached the age of majority in October 2020."

[2] Our record does not explain why Husband's Answer refers to Wife's "amended complaint" or why Husband filed two answers to the same complaint. The record includes: (1) Wife's complaint filed in January 2019; (2) Husband's "Answer to Plaintiff's Amended Complaint" filed 5 March 2019; (3) Husband's second "Answer Plaintiff's Amended Complaint," including his counterclaims, filed 26 March 2019; (4) Wife's reply to Husband's counterclaims filed on 27 June 2019; and (5) Wife's amended complaint filed 18 December 2020. No issue on appeal concerns the claims or the propriety of the pleadings.

restraining order; and absolute divorce.[3] Wife replied to Husband's counterclaims on 27 June 2019.

On 13 February 2020, Wife filed an amended complaint raising the same claims. Two limited liability companies—McKenzie Cronk, LLC (McKenzie or McKenzie Cronk) and Denison Cronk, LLC (Denison or Denison Cronk)—were later joined as third-party Defendants.

Denison Cronk is registered in both Wife's and Husband's names and "was founded in 2006 to manage [their] multiple rental properties," including properties located on South Shore Drive, Page Avenue, Machine Gun Trail, and Cross Creek Drive, which made up "the remaining properties in the parties' marital estate at . . . separation." Denison Cronk generated income by collecting rental proceeds and deducting associated management costs, with South Shore Drive ("a beach property") being the most profitable. After the parties' separation, Husband managed all of Denison's properties on his own except for Machine Gun Trail. Wife's adult son lived at Machine Gun Trail until 2022, and she continued to manage the property.

McKenzie Cronk, founded in 2013, was registered only in Wife's name. She "primarily managed" the company's "day-to-day operations" during the marriage. McKenzie Cronk's main business, Patio Playground, operates as an "entertainment

---

[3] The trial court entered an absolute divorce judgment on 1 April 2022.

venue" in Topsail Beach, featuring mini-golf courses and arcades, selling ice cream and novelties, and collecting ATM surcharge fees. Husband "assist[ed] in the [business's] operations" and "was responsible for making . . . bank deposits." After the parties separated, Wife assumed sole control of McKenzie Cronk.

On 20 October 2022, the trial court entered an order distributing the parties' household items and personal property. That same day, the parties and their counsel signed a final pretrial order stipulating to the classification, valuation, and distribution of certain marital and divisible property. For the properties with stipulations as to classification, valuation, and distribution, no further evidence was required; the remaining disputes were reserved for trial. The court held an equitable distribution hearing on those issues on 26 and 27 October 2022, at which both parties testified and presented evidence.

On 12 January 2024, the trial court entered an order ruling on the distribution of the remaining property, along with alimony[4] and child support. The court also imposed sanctions on Wife under North Carolina General Statute Section 50-21(e) "on its own motion." *See* N.C. Gen. Stat. § 50-21(e) (2023) (allowing the court, "upon [its] own initiative," to "impose an appropriate sanction on a party when the court

---

[4] The court's order noted that, at trial, Husband's counsel moved to dismiss Wife's alimony claim. In response, Wife stipulated that she "no longer wished to pursue her alimony claim" and that the claim should be dismissed. The court accordingly dismissed the claim.

finds that" certain criteria are met).

The order has extensive findings of fact classifying, valuing, and distributing the parties' marital and divisible property, including the two LLCs, multiple rental and investment properties, the marital home, contents of safe deposit boxes, retirement accounts, insurance proceeds, and other assets and liabilities. It incorporates a spreadsheet, attached as Exhibit A, itemizing each asset and liability, its classification, its value at the date of separation and the date of distribution, and the party to whom it was distributed.

As to equitable distribution, the court found that "an equal division of the parties' marital and divisible property [wa]s equitable." The court noted that the parties had stipulated to distribution for some items of marital property. But given the nature of the contested estate—which included closely held business entities and properties that could not be split evenly—an in-kind distribution, "by the greater weight of the evidence," was not equitable. *See* N.C. Gen. Stat. § 50-20(e) (2023) ("[I]t shall be presumed in every action that an in-kind distribution of marital or divisible property is equitable. This presumption may be rebutted by the greater weight of the evidence, or by evidence that the property is a closely held business entity . . . ."). So the court ordered Wife to pay Husband $68,791.97 as a distributive award "[t]o achieve an equitable distribution of the parties' marital estate."

As for child support, the court calculated the parties' respective incomes: Wife

earned $10,812.48 per month "for the years 2017 [through] 2020"; Husband earned $10,661.84 per month. Based on the North Carolina Child Support Guidelines, the court ordered Wife to "pay retroactive and [past-]prospective child support as arrears to [Husband] in the amount of $58,572," payable at a rate of $1,500 per month beginning 1 January 2023.[5] The court denied Husband's request for attorney's fees in connection with his child support claim.

As to sanctions, the court found that Wife had "willfully obstructed and unreasonably delayed" the proceedings. Among other things, Wife "[r]efused to provide discovery responses"; testified under oath that requested documents "did not exist," only to later attempt to introduce those documents at trial; and produced a hard drive that had been "cleaned" before she turned it over to Husband. The court concluded that Wife's actions "were undertaken knowingly and voluntarily to conceal income for the Patio Playground and in an effort to conceal potential insurance fraud." As a sanction, the court required Wife to reimburse Husband $34,437.50 for

---

[5] These amounts are not technically "arrears." "Arrears are past-due child support payments that have already been ordered and are vested as they accrue." *Collins v. Holley*, 299 N.C. App. 323, 325 n.1, 919 S.E.2d 24, 29 n.1 (2025) (citation omitted). No court had ordered child support here—these "were newly established child support obligations." *Id.* The support awarded before Husband filed his child support claim on 26 March 2019 is retroactive child support—"[c]hild support awarded prior to the time a party files a complaint." *Loosvelt v. Brown*, 235 N.C. App. 88, 93, 760 S.E.2d 351, 355 (2014) (citation omitted). The support awarded after that date—through October 2020, when the youngest child reached majority—is past-prospective, covering "the time period between the filing of a claim for child support and entry of an order for child support." *Collins*, 299 N.C. App. at 325 n.1, 919 S.E.2d at 29 n.1 (citation omitted).

the cost of retaining an expert to locate the information Wife refused to provide.

Wife timely appealed.

## II.    Equitable Distribution

Wife raises ten issues about the equitable distribution portion of the trial

court's order.  We outline our standard of review and then address each in turn.

## A. Standard of Review

This Court reviews an equitable distribution order to determine "whether

there is competent evidence to support the trial court's findings of fact and whether

the findings support the conclusions of law and ensuing judgment." *Asare v. Asare*,

281 N.C. App. 217, 236, 869 S.E.2d 6, 20 (2022) (citation omitted).  "Competent

evidence is evidence that a reasonable mind might accept as adequate to support the

finding." *In re Adams*, 204 N.C. App. 318, 321, 693 S.E.2d 705, 708 (2010) (quotation

marks and citation omitted).  Findings of fact

> are binding on appeal as long as competent evidence
> supports them, despite the existence of evidence to the
> contrary.
>
> The trial court's findings need only be supported by
> substantial evidence to be binding on appeal.  We have
> defined substantial evidence as such relevant evidence as
> a reasonable mind might accept as adequate to support a
> conclusion.

*Peltzer v. Peltzer*, 222 N.C. App. 784, 786, 732 S.E.2d 357, 359 (2012) (cleaned up).

"[U]nchallenged findings of fact are presumed to be supported by competent evidence

and are binding on appeal." *Klein v. Klein*, 290 N.C. App. 570, 577, 892 S.E.2d 894, 903 (2023) (citing *Peltzer*, 222 N.C. App. at 787, 732 S.E.2d at 360).

"As to the actual distribution ordered by the trial court," our "standard of review is limited to a determination of whether there was a clear abuse of discretion." *Stovall v. Stovall*, 205 N.C. App. 405, 407, 698 S.E.2d 680, 683 (2010) (citation omitted). A trial court abuses its discretion if it "failed to comply with the statute" governing equitable distribution, or if its actions were manifestly "unsupported by reason and could not have been a result of competent inquiry." *Wiencek-Adams v. Adams*, 331 N.C. 688, 691, 417 S.E.2d 449, 451 (1992) (citations omitted); *see also* N.C. Gen. Stat. § 50-20(a) (2023) ("Upon application of a party, the court shall determine what is the marital property and divisible property and shall provide for an equitable distribution of the marital property and divisible property between the parties in accordance with the provisions of this section.").

## B. Safe Deposit Box, Insurance Proceeds, and Rental Income

Wife's first four issues concern the trial court's findings on the contents of PNC safe deposit box #235; the disposition of insurance proceeds for the Machine Gun, South Shore, and Anderson properties; the treatment of Denison Cronk rental income; and the diversion of South Shore rental proceeds. We make some preliminary observations before turning to the merits.

### 1. *Preliminary Observations*

Wife casts many of her arguments as challenges to the competency of the evidence. But that overstates her actual contentions. She does not argue that any evidence was improperly admitted or that the record is devoid of evidence supporting the challenged findings. *See generally Klein*, 290 N.C. App. at 580-81, 892 S.E.2d at 904-05 (identifying the husband's argument that an email should not have been admitted as his "only specific substantive argument as to a lack of competent evidence"). And she never contends that Husband's testimony and exhibits were not "evidence that a reasonable mind might accept as adequate to support the finding." *In re Adams*, 204 N.C. App. at 321, 693 S.E.2d at 708.

Her arguments "mostly address[ ] conflicting evidence" and ask this Court to resolve those conflicts differently. *Klein*, 290 N.C. App. at 580, 892 S.E.2d at 904. On the safe deposit box, she argues that the trial court should not have inferred that box #235 contained $50,000 at separation because she accessed the box beforehand—but the trial court heard both parties' testimony and credited Husband's, which bank records corroborated. On the insurance proceeds, she claims that because the checks were deposited into marital accounts, the court could not find she personally "received" them. The trial court's findings, however, rest on her inability to account credibly for how the funds were spent, not merely on the initial deposit. And on the Denison Cronk and South Shore property issues, she insists that moving funds between two marital accounts cannot be a "diversion" to her personally. But the trial

court found that she redirected income, refused to cover corresponding expenses, and could not credibly explain the resulting shortfall. In each instance, Wife's real grievance is not that the evidence was incompetent or insufficient but that the trial court believed Husband over her.

Yet this Court has long held that the "credibility of the evidence in an equitable distribution trial is for the trial court." *Grasty v. Grasty*, 125 N.C. App. 736, 739, 482 S.E.2d 752, 754 (1997) (citation omitted). That court "is in the best position to weigh the evidence" and "determine the credibility of witnesses and the weight" to "give[ ] their testimony." *Williamson v. Williamson*, 217 N.C. App. 388, 392, 719 S.E.2d 625, 628 (2011) (citation omitted); *see also Klein*, 290 N.C. App. at 580, 892 S.E.2d at 904 ("[T]he trial court has the duty to consider the credibility of the evidence and to resolve those conflicts in the evidence."). Unlike appellate judges, who review only a cold, paper record, trial court judges "see[] the witnesses" and "observe[ ] their demeanor as they testify." *Shomette o/b/o T.N. v. Needham*, 298 N.C. App. 400, 406, 915 S.E.2d 39, 44 (2025) (citation omitted). "[A]s the finder of fact in an equitable distribution case," the trial court "has the right to believe all," "nothing," or "part of" a witness's testimony. *Grasty*, 125 N.C. App. at 739, 482 S.E.2d at 754.

The trial court exercised that authority here, resolving several credibility disputes against Wife based on her own conduct: it found that "[t]hroughout the course of this litigation, [she] ha[d] willfully obstructed and unreasonably delayed

and/or attempted to obstruct or unreasonably delay" the proceedings. Among other things, Wife:

- refused "to provide discovery responses . . . in the time prescribed on several occasions," forcing Husband to file several motions to compel;

- testified "under oath that she did not have access to such documents or that the requested documents did not exist," only to acknowledge their existence at trial;

- provided "extremely deficient" discovery responses, repeatedly claiming she had already given Husband "the requested documents";

- attempted to introduce at trial documents "that she had refused" to produce in discovery; and

- turned over a hard drive that appeared to have been "clean[ed]" before it reached Husband's counsel.

She also knowingly underreported business income to experts, Husband, and the IRS. The court ultimately concluded that Wife's "actions were undertaken knowingly and voluntarily to conceal income for the Patio Playground and in an effort to conceal potential insurance fraud."

That conduct gave the trial court ample reason to question Wife's credibility—and to credit Husband's evidence where the two conflicted. The order itself spans fifty-three pages and contains over fifty detailed findings of fact, supported by more than two hundred sub-findings and several tables itemizing income, expenses, and property values. Those findings address the classification, valuation, and

distribution of the parties' marital and divisible property: two LLCs, multiple rental and investment properties, the marital home, safe deposit boxes, retirement accounts, insurance proceeds, and other assets and liabilities. An attached spreadsheet itemizes each asset and liability, its classification, its value at the date of separation and distribution, and the party to whom it was distributed. The trial judge below did not, in other words, simply pick one party's testimony over another's without explanation. In each instance, the court heard conflicting evidence, made detailed credibility findings, and resolved those conflicts against Wife.

With that backdrop in mind, we turn to Wife's specific arguments.

### 2. *Cash in Safe Deposit Box #235*

In finding 12, the trial court found that the parties disputed the contents of PNC safe deposit box #235 at the date of separation. Husband claimed that the box held $50,000; Wife maintained it held $5,000. The court recognized that "the issue [wa]s one of credibility" because both parties had "provided competing testimonies as to the use and holdings in both [b]oxes." It found Husband's testimony "credible" for several reasons: his bank statements showed deposits into the McKenzie Cronk account on the same days he accessed the box; he was "responsible for depositing funds" and "preserving cash from the business" and thus had "better knowledge of the cash on hand than" Wife, who kept no records; the day the parties opened a different safe deposit box, box #105, both boxes were accessed simultaneously,

thereby corroborating his testimony that the parties transferred funds between them at that time; and Wife offered no corroborating evidence beyond her own testimony, which the court noted "ha[d] been discredited throughout this case and in th[e] hearing on multiple occasions." The court valued box #235 at $50,000; distributed $5,000 to Husband; and distributed the remaining $45,000 to Wife.

Wife argues that Husband failed to present competent evidence that safe deposit box #235 "contained $50,000 on the date of separation." She notes that the sign-in sheet for box #235 shows she accessed the box on 30 August 2016—"almost a year before" the parties separated on 31 July 2017. Because that access occurred "during the marriage," Wife reasons, "one cannot infer that the contents" Husband described in April 2016 remained in the box at separation. We disagree.

To begin, Wife relies primarily on *Bowman v. Bowman*, 96 N.C. App. 253, 256, 385 S.E.2d 155, 157 (1989), for the proposition that testimony about a safe's contents five months before separation is "no basis" for finding the same amount was present at separation. Wife's reliance is misplaced.

In *Bowman*, the husband claimed that $46,000 was in a safe at the parties' home "approximately five months before" separation. *Id.* The wife testified that "there was never more than $2,500 in the safe." *Id.* This Court rejected the husband's argument for two reasons: the conflict in evidence "was for the finder of fact to resolve," and a single account of the safe's contents five months before separation was

"no basis" for overturning the trial court's refusal to find the money was still there at separation. *Id.*

Both grounds cut against Wife here. The finder of fact resolved the credibility dispute in Husband's favor—not Wife's—and did so based on far more than a single uncorroborated account. *See Arrington v. Arrington*, 298 N.C. App. 313, 321, 914 S.E.2d 569, 575 (2025) ("[T]he trial court is the fact finder in equitable distribution cases . . . ."). Unlike the husband in *Bowman*, whose testimony offered only an isolated snapshot of the safe's contents months before separation, Husband's account was corroborated by bank records and access logs showing deposits into the McKenzie Cronk account on the same days he accessed the box; this evidence supports his testimony regarding the period leading up to separation, not only a single moment months earlier. Wife offered nothing beyond her own discredited testimony. The trial court weighed that evidence and resolved the dispute against her. We do not reweigh that evidence on appeal. *See Williamson*, 217 N.C. App. at 392, 719 S.E.2d at 628.

Finally, Wife notes that the order references $50,000 as the amount in box #235, while Husband testified the amount was $51,000. She is correct that the evidence shows $51,000 and not $50,000. But a $1,000 discrepancy in the context of this case is *de minimis* and does not require reversal. *See, e.g., Comstock v. Comstock*, 240 N.C. App. 304, 313, 771 S.E.2d 602, 609 (2015) (concluding that an error amounting to "0.6% of the adjusted value of the marital estate" was "*de minimis*" and

did "not warrant reversal"); *Kleoudis v. Kleoudis*, 271 N.C. App. 35, 53, 843 S.E.2d 277, 289 (2020) (finding a miscalculation constituting "less than 2% of the total arrears" to be *de minimis*).

Competent evidence supports the trial court's finding that box #235 contained $50,000 at separation. *See Asare*, 281 N.C. App. at 236, 869 S.E.2d at 20.

### 3. *Insurance Proceeds for the Machine Gun, South Shore, and Anderson Properties*

Wife next argues that the trial court erred in distributing insurance proceeds for the Machine Gun ($16,530), South Shore ($14,004), and Anderson ($119,559.54) properties to her. She challenges several findings of fact across all three. We assess each in turn.

#### a. *Machine Gun*

Finding 16(a) states that Wife "received insurance proceeds in the amount of $16,530 following Hurricane Florence for damage sustained to the property located at . . . Machine Gun." Wife challenges this finding as "unsupported by competent evidence," arguing that it implies she "transferred that money to her personal possession."[6]

Wife does not challenge findings 16(b) through 16(e), which are thus "presumed

---

[6] Wife contests finding 16(f) for the same reason she contests finding 16(a): its "reference[ ] to [her] receiving the payment implies that she somehow transferred that money to her personal possession."

to be supported by competent evidence and are binding on appeal." *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903. Those findings show that Wife "provided some documentation that she contended proved the insurance proceeds were spent in the repair of the [Machine Gun] property," including "an invoice from Gregory Hanna Jr. [(Hanna)] for alleged roof repair, and some handwritten notations of expenses, such as large cash payments" to her three sons "for work performed."[7] Wife also confirmed at trial that "a new roof was installed" on the property.

But the trial court, according to the unchallenged findings, was not persuaded that "the insurance proceeds were[,] in fact[,] used to repair" the Machine Gun property. "Due in large part to" its condition "at the time of the appraisal in 2022," the court found that the property had lost "over $64,500 . . . in value from the date of separation to 2022" and was "currently in such a state of disrepair that it [wa]s uninsurable;" the court treated this as "additional evidence that the repairs were not made." Wife had "managed the property and was responsible for" it since separation, and Husband testified on cross-examination she "failed to invest insurance funds to repair the property," leaving it "uninhabitable" and "not insurable." Her bank records were also telling—they revealed no "coordinating cash withdrawals for the alleged amounts paid to [her] sons." And the documentation she produced at trial "had not

_____

[7] The trial court made extensive findings about Hanna and the reliability of his invoices. We discuss those below.

been disclosed to [Husband] in discovery" and showed that she had paid Hanna "for the same roof work that she purportedly paid her . . . sons" to perform.

Competent evidence supports finding 16(a). *See Asare*, 281 N.C. App. at 236, 869 S.E.2d at 20. The trial court did not need to trace the proceeds into Wife's personal bank account to find she "received" them. It needed to find only that she controlled the funds and could not credibly account for their use, and that is what the unchallenged findings show. The property deteriorated dramatically after separation, Wife's documentation was riddled with inconsistencies, and her bank records did not corroborate her claimed expenditures. The trial court weighed that evidence and found Wife's account not credible.[8] That determination was the trial court's to make. *See Grasty*, 125 N.C. App. at 739, 482 S.E.2d at 754.

### b. South Shore

Finding 17(a) states that Wife "received insurance proceeds in the amount of $14,004.00 following Hurricane Florence for damage sustained to the [South Shore] property." In finding 17(c), the court distributed those proceeds to Wife because she "received the insurance proceeds" and "the repairs for which the proceeds were intended had not been completed."

---

[8] The trial court did not explicitly find that Wife was "not credible" in this finding, but it did not need to. *See Hartsell v. Hartsell*, 189 N.C. App. 65, 75, 657 S.E.2d 724, 730 (2008) ("[T]he trial court is not required to make findings about the weight and credibility it assigns to the evidence before it."). The clear import of the court's findings is that it did not credit Wife's account.

Wife challenges both findings as "unsupported by competent evidence." She again claims that the trial court's use of the word "received" was unfounded because she deposited the proceeds into the Denison Cronk account, which was ultimately distributed, so both parties "received their credit for those funds." That argument fails for the same reasons as her Machine Gun argument.

Wife does not challenge finding 17(b), which is therefore "supported by competent evidence" and "binding on appeal." *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903. In that finding, the court stated that

> b. [Husband] testified credibly that the insurance proceeds received had not been used to repair damage to the roof of the property, which was the reason that [Wife] refused to sign the insurance check provided to repair the roof following Hurricane Isaias. [Wife] also admitted to [the] same.

Husband's testimony bore this out: Wife was responsible for repairs to South Shore after Hurricane Florence, the roof was never fixed and continued to leak, and when a subsequent insurance check arrived, she refused to endorse it—because, as Husband explained, "it was a claim that was duplicative from the [Hurricane] Florence repairs that had never been done." That refusal was, in effect, an admission that the first round of proceeds had not been used for their intended purpose.

Competent evidence supports the challenged portions of finding 17. *See Asare*, 281 N.C. App. at 236, 869 S.E.2d at 20. Husband's credited testimony clarifies that Wife received and controlled the proceeds and did not use them to repair the property,

and her own conduct confirmed it. The initial deposit into the Denison Cronk account does not change that conclusion. The credibility determination underlying that finding belonged to the trial court, and we do not disturb it here. *See Grasty*, 125 N.C. App. at 739, 482 S.E.2d at 754.

c. *Anderson*

Finding 18(a) states that Wife "received insurance proceeds in the amount of $143,735.93 following Hurricane Florence for damage sustained to" the Anderson property, and the trial court distributed $119,559.54 to her—reflecting "$143,735.93 less recoverable depreciation." Findings 18(d) and 18(e) address an invoice from Hanna and the financial and personal circumstances surrounding Wife's relationship with him. Finding 18(d)(x) states that an insurance company "issued" insurance proceeds to Wife. Finding 18(e) says that Wife "accepted insurance proceeds for work that was not performed, for work for which [she and Hanna] [we]re not licensed, and for work for which no permits were filed." And 18(e)(vi) adds that Wife "withdrew $68,614.09 from the McKenzie Cronk . . . bank account"—an amount matching "to the cent" her payment on the Hanna invoice, nine days before Hanna purchased a property for $200,000 in cash.

Wife challenges several of these findings. In particular, she contests finding 18(a), 18(d)(x), and 18(e) on the same ground she raised for Machine Gun and South Shore: because Denison Cronk "received the proceeds" rather than her personally,

the court's finding she "received," was "issued," and "accepted" the proceeds are unsupported. She disputes finding 18(e)(vi) for different reasons, arguing that the $68,614.09 withdrawal reflects only a payment on Hanna's invoice—not a transfer into a personal account. And she challenges finding 18(e)(viii)'s statement it was "reasonable to conclude" that she and Hanna "used funds intended for the repairs of the properties . . . to purchase" Hanna's new property, asserting that no evidence showed she had any interest in the property or contributed marital funds to its purchase.

Wife does not challenge findings 18(b) or 18(c)—including finding 18(c)'s statement she "admitted at trial that the roof had not yet been repaired." She also does not challenge the bulk of the detailed sub-findings within 18(d) describing the problems with the Hanna invoice, or the sub-findings within 18(e) outlining the financial circumstances surrounding Hanna's property purchase. So those findings are binding on appeal. *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903.

Collectively, the unchallenged findings show that the Hanna invoice, dated 10 January 2019 and totaling $144,003.16, purported to cover "the necessary repairs to the property." The court found it "extremely problematic for many reasons." For one, it called for "extensive repairs" requiring "licensed third-party contractors," including "electricians and HVAC contractors"—yet Wife provided no invoices for those services, no receipts for repair supplies, and only a single permit for the Anderson

property. That permit covered "repairs to the roof, fence, and pergola only" and said nothing about the interior electrical or HVAC work the invoice listed.

Still more, the trial court found that Wife applied for the permit on 9 January 2019—"one day before the invoice was dated"—and when it issued on 14 January 2019, she estimated repair costs at "$80,000.00 and listed the general contractor as 'TBD.'" The invoice "was prepared by and payable to [Hanna], who is not a licensed contractor," despite representing "that he is 'N.C. licensed and insured.'" Hanna and Wife performed the electrical and HVAC work themselves, though neither held the required licenses. Wife denied doing any electrical work on cross-examination, but Hanna had testified at deposition Wife "had done most of the work herself." She admitted that Hanna "undertook the repairs and that she assisted him" but denied receiving "any discount or payment for her contributions." The invoice also included "$32,550" for roof repair—work Wife admitted at trial had never been completed. And the payments listed on the invoice as made in January 2019 were not actually made until August and December of that year, even though the insurance company confirmed that the full proceeds had been issued to Wife by April 2019—meaning she "could have easily paid the invoices" months earlier. Based on all of this, the court found Wife's testimony about the work performed and her contributions to it "not credible."

The unchallenged sub-findings in finding 18(e) regarding Wife's relationship

with Hanna are equally significant. The trial court found that Hanna—who is "not a licensed contractor"—was "the sole person" Wife engaged to repair the Anderson, Machine Gun, and South Shore properties. Wife claimed "that she had paid . . . Hanna and her three . . . sons" for this work, but many of the repairs were never completed. A private investigator later observed Hanna working at Patio Playground, reinforcing Wife's earlier deposition testimony he maintained the arcades and "counted and distributed the arcade proceeds between himself and [Wife]." At trial, though, Wife "changed" her testimony. The trial court also found that on 10 December 2019, Wife withdrew $68,614.09 from the McKenzie Cronk account—an amount that "matche[d] to the cent" the second payment on Hanna's invoice. Nine days later, Hanna purchased a property for $200,000 cash. Wife's vehicle was later seen at that property.

Competent evidence supports each of the challenged findings. Wife's argument on finding 18(a)—that she did not "receive," was not "issued," and did not "accept" the Anderson insurance proceeds—fails for the same reasons it failed for Machine Gun and South Shore: The trial court's findings do not rest on tracing the proceeds into Wife's personal bank account, but on its determination that she controlled the proceeds, claimed to have spent them on repairs through Hanna, and could not credibly account for how they were used. The court heard Wife's explanations for the discrepancies in the Hanna invoice and found them unpersuasive. That credibility

determination is not ours to second-guess. *Grasty*, 125 N.C. App. at 739, 482 S.E.2d at 754.

Wife's challenge to finding 18(e)(vi)—that she "withdrew $68,614.09 from the McKenzie Cronk" bank account—fares no better. Wife does not dispute that $68,614.09 left the account or that Hanna received funds in that amount; she argues only that this was a legitimate payment for services, not a personal withdrawal. As she puts it: "Paying a repairman is not the same as personally receiving those funds."

But Wife is not arguing that the evidence was inadmissible or unreliable—she is arguing that the trial court should have drawn a different inference from it. That is a challenge to the weight of the evidence, not its competency. And besides, that inference was the trial court's to draw. *See Sauls v. Sauls*, 236 N.C. App. 371, 373, 763 S.E.2d 328, 330 (2014) ("It is the duty of the trial judge 'to weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom.'" (citation omitted)). That court evaluated the Hanna invoice, found it unreliable, and determined that Wife and Hanna accepted insurance proceeds for work that was never performed by individuals who were neither licensed nor permitted to perform it. Whether the $68,614.09 is characterized as a withdrawal or a payment, the underlying evidence is competent evidence supporting the finding: a dollar-for-dollar match between the McKenzie Cronk withdrawal and the invoice amount, paid to an

unlicensed individual under an invoice the court found "extremely problematic."

Finally, Wife challenges finding 18(e)(viii)'s statement that it was "reasonable to conclude that [she and Hanna] used funds intended for the repairs of the properties . . . to purchase the property." She dismisses the evidence of a personal relationship with Hanna as thin—the parties had known him since 2009, named him guardian of their children, and on one occasion someone observed a vehicle matching Wife's at his home. But the court's finding that their relationship "extends beyond a business relationship" did not rest on those facts alone. It rested on the cumulative weight of the financial evidence detailed above: the dollar-for-dollar match between the McKenzie Cronk withdrawal and the Hanna invoice, Hanna's cash purchase of a $200,000 property nine days later, and Wife's vehicle observed at that property. All of that, combined with Wife's inability to credibly account for how the insurance proceeds were spent, gave the court ample basis for finding 18(e)(viii). A reasonable mind could accept this evidence as adequate to support the finding.[9] *See In re Adams*,

---

[9] Wife also argues that if the trial court was "effectively faulting" her for ineffective use of insurance proceeds, it needed to make specific findings of waste under North Carolina General Statute Section 50-20(c)(11a) or marital misconduct under Section 50-20(c)(12). But the court was not invoking Wife's use of the proceeds as a distributional factor—it was determining what happened to specific divisible property so that it could distribute it equitably, as Section 50-20(a) requires. *See* N.C. Gen. Stat. § 50-20(a) (2023) ("Upon application of a party, the court shall determine what is the marital property and divisible property and shall provide for an equitable distribution of the marital property and divisible property between the parties . . . ."); *see also Brackney v. Brackney*, 199 N.C. App. 375, 381, 682 S.E.2d 401, 405 (2009) ("Equitable distribution is governed by [Section] § 50–20 . . . , which requires the trial court to conduct a three-step process: (1) classify property as being marital, divisible, or separate property; (2) calculate the net value of the marital and divisible property; and (3) distribute

204 N.C. App. at 321, 693 S.E.2d at 708.

Competent evidence supports the trial court's findings on each of the three properties. *See Asare,* 281 N.C. App. at 236, 869 S.E.2d at 20.

### 4. *Denison Cronk Rental Income for 2017–2021*

In finding 14, the trial court turned to the Denison Cronk rental income for 2017 through 2021. Across findings 14(a) through 14(j), the court found that Husband took over managing the Denison Cronk rental properties in 2019 after the parties separated, though Wife continued to pay some expenses from the business's account. The parties used "the services of a third-party company, VRBO, to manage" the South Shore property—the property that "earned the majority of the rental income." The court classified "the income received" from that property as "passive income insofar as the parties relied primarily on . . . VRBO . . . to manage" it—and thus divisible property. *See* N.C. Gen. Stat. § 50-20(b)(1a)(d) (2023) (defining divisible property to include "[p]assive income from marital property received after the date of separation").

Using the VRBO proceeds deposited in the Denison account, the court then calculated net rental income figures for 2017 through 2021:

> f. After the parties[] separated, the following amounts

---

equitably the marital and divisible property."). The court did not abuse its discretion in distributing those proceeds to the party who received, controlled, and could not account for them. *See Wiencek-Adams v. Adams*, 331 N.C. 688, 691, 417 S.E.2d 449, 451 (1992).

were deposited into the Denison Cronk . . . account:

    i. 2017: $12,850.00

    ii. 2018: $42,298.00

    iii. 2019: $38,322.00

    iv. 2020: $15,308.00

    v. 2021: $38,358.00

g. From the amounts deposited, [Husband] paid expenses relating to the properties.

h. Thus, reducing the rental proceeds by the expenses paid from the Denison Cronk account, [Husband] received the following in rental proceeds following the separation of the parties:

    i. 2017: $4,793.00

    ii. 2018: ($34,260.80)

    iii. 2019: ($18,386.94)[10]

    iv. 2020: ($198.36)

    v. 2021: $38,358.00

The deficits in 2018, 2019, and 2020, the court found, resulted from Wife's "diversion of rental proceeds from the Denison Cronk . . . account to the McKenzie Cronk . . . account," which forced Husband "to pay some expenses for the rental properties out

---

[10] Throughout its findings, the trial court used parentheses to denote negative numbers. For example, ($18,386.94) means negative $18,386.94.

of his individual funds." The court distributed Denison's net income figures for 2017 through 2021 to Husband "as divisible income and divisible debt."

Wife does not challenge: (1) the classification of the 2017 through 2021 Denison Cronk rental income as divisible property, (2) the finding that the deficits resulted from her "diversion of rental proceeds," or (3) the finding that Husband was "forced . . . to pay some expenses for the rental properties" from his own funds. And she does not dispute any of the finding's underlying figures—the VRBO deposits, the expenses paid from the Denison account, or the net income calculations.[11] Those findings are thus binding on appeal, and competent evidence supports them. *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903.

Wife raises two arguments against the trial court's distribution. First, she contends that diverting funds from the Denison Cronk account to the McKenzie Cronk account did not funnel money "from the marital estate to [herself] separately"—because both accounts were marital property distributed to both parties. Second, she claims that to the extent Husband paid Denison Cronk expenses

---

[11] To be sure, Wife does state that "[a]ll the figures" in finding 14 are "unsupported insomuch as they state or imply that [Husband] paid marital expenses with separate funds, or that [she] personally retained marital income." But the qualifier really says it all—Wife takes issue with the figures only "insomuch as they state or imply" something about how the funds were used. So she does not a challenge the figures themselves—she does not argue that the Denison bank statements are inaccurate, that the math is wrong, or that the expenses were not actually paid. Her actual objection is to what the court did with those figures: She insists that the court should not have distributed them to Husband because it resulted in him receiving a "credit corresponding to the net proceeds of the Denison rental income." That argument fails for the reasons we explain above.

from his own funds, any credit must be traceable to "his separate funds," and that for every year except 2019, he "failed to present any evidence as to how much he may have paid from separate funds." Neither argument holds up.

As to Wife's first argument, she conflates different assets in the equitable distribution ledger: the accounts themselves and the postseparation rental income flowing through them. The Denison and McKenzie accounts were marital property, valued at the date of separation—a snapshot of each account's balance at that time. *See* N.C. Gen. Stat. § 50-21(b) ("[M]arital property shall be valued as of the date of the separation of the parties[.]"). By contrast, the rental income deposited into the Denison account *after* separation was divisible property, valued at the date of distribution. *See id.* ("Divisible property and divisible debt shall be valued as of the date of distribution."). Put another way, finding 14 captures those postseparation VRBO deposits—the "divisible income and debt"—that the distribution of the marital accounts could not capture. Distributing one did not account for, or offset, the other.

Wife's second argument fares no better. Husband, she argues, failed to show how much he paid from separate funds—but that framing assumes the court was crediting Husband for personal expenditures. It was not. The court was distributing divisible property. Wife's separate-funds argument belongs to a different context— where a spouse seeks credit for paying marital debts out of pocket. *See, e.g.*, *Bodie v. Bodie*, 221 N.C. App. 29, 34, 727 S.E.2d 11, 15 (2012) ("A spouse is entitled to some

consideration, in an equitable distribution proceeding, for any post-separation payments made by that spouse (from non-marital or separate funds) for the benefit of the marital estate." (citation omitted)).  That is not what happened here.

And in any event, competent evidence supports finding 14.  Husband testified that the Denison account was being "paid down" each month because VRBO rental income "was not coming in," and that he never used Denison Cronk income for personal expenses.[12]  To cover the shortfall, he paid the properties' expenses from his personal account.  He also offered into evidence, without objection, Denison Cronk's bank statements from 2017 through 2021 and his own spreadsheets covering the same period—documenting the VRBO deposits, the properties' expenses, and the amounts he had to pay to cover them from his own funds.

For her part, Wife agreed that she had "at times draw[n] money from Denison Cronk to meet a McKenzie Cronk need," and that McKenzie Cronk had likewise covered Denison Cronk expenses.  She also confirmed that all VRBO deposits benefited Denison Cronk.  And she submitted a self-made chart showing that McKenzie Cronk transferred nearly $170,000 back to Denison Cronk from 2017 to

---

[12] Wife emphasizes that the $18,386.94 deficit for 2019 in finding 14(h) far exceeds the $6,241.19 Husband testified he paid from his personal account that year, arguing that his out-of-pocket expenses did not match the diverted rental proceeds.  But the two figures measure different things.  The $6,241.19 is what Husband testified he paid out of pocket in 2019; the $18,386.94 is the net of all Denison account expenses reduced against that year's VRBO deposits.  The court was calculating net rental income, not reimbursing Husband for personal expenditures.  The $6,241.19 merely corroborates that Wife's diversion forced Husband to cover some expenses personally that year.

2020, leaving Denison owing McKenzie a balance of over $4,500. But still, the court credited Husband's evidence over Wife's.

On appeal, Wife does not argue that Husband's exhibits were improperly admitted or that they inaccurately reflect the income and expense figures. Her dispute is with how the court weighed the competing evidence—and that is not ours to second-guess on appeal. *See Williamson*, 217 N.C. App. at 392, 719 S.E.2d at 628 (refusing "to re-weigh the evidence on appeal" because "the trial court is in the best position to weigh the evidence, determine the credibility of witnesses and the weight to be given their testimony" (cleaned up)). Competent evidence supports finding 14, *see Asare*, 281 N.C. App. at 236, 869 S.E.2d at 20, and the court did not abuse its discretion in distributing Denison Cronk's rental income for 2017 through 2021 to Husband. *See Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683.

### 5. *Diversion of South Shore Rental Proceeds*

In finding 15, the trial court addressed Wife's diversion of the South Shore property's rental proceeds. It found:

> a. In May 2018, [Wife] unilaterally changed the deposit account for the rental proceeds for the [South Shore] property . . . from the Denison Cronk . . . account to the McKenzie Cronk . . . account.
>
> b. Though [Wife] deposited some funds back into the Denison Cronk . . . account, [Wife] did not deposit enough funds to cover the costs of the properties. [Wife] admitted that the Denison Cronk . . . account did not have enough funds in the account to cover the costs of the properties in

an email to [Husband] . . . . Throughout 2019, [Wife] continued to write checks from the Denison Cronk . . . account to cover some of the property costs, despite knowing that account was low on funds.

c. [Husband] requested on multiple occasions that [Wife] transfer the rental proceeds to the Denison Cronk . . . account to cover the property costs but [Wife] refused to do so. On one occasion, in September 2019, [Wife] responded to [Husband's] request in an extremely rude and disparaging manner, claiming that [Husband] . . . changed the deposit in July 2019 but that he may have forgotten "due to [his] head injury which [he] used as an excuse for John Liverman." [Wife] then opined that [Husband] more than likely had an excuse for not remembering, being either (1) raising the kids; (2) killing Buddy; (3) busy with VRBO; or (4) possibly [Husband] didn't remember.

d. Despite having received $70,638.17 in rental proceeds in 2019 for the [South Shore] property . . . the Denison Cronk . . . bank account had a balance of $958.45 at the time [Wife] unilaterally and without informing [Husband], closed the account in December 2019. At the time [Wife] closed the account, she had issued a [c]ashier's [c]heck for the remaining balance to [Husband's] attorney's office with [Husband's] name on the check, but then endorsed the check to herself as "not for purpose intended."

e. Between [23 May] 2018, and [9 January] 2020, a total of $165,910.38 was received in rental proceeds from the [South Shore] property . . . . From that amount, [Wife] deposited $63,228.99 into the Denison Cronk . . . account and $913.47 was deposited into the Denison Cronk . . . account by VRBO, leaving a balance of $101,767.92, which proceeds [Wife] retained.

The trial court also found, in finding 15(f), that Wife "presented evidence that she had returned funds" or "had paid costs" from the McKenzie Cronk account on Denison

Cronk's behalf. But the evidence fell short on every front. Wife provided no receipts for the alleged costs, claimed expenses for the Oleander Drive property that had already been recouped through its sale, included personal expenses like gas and food as reimbursements, and counted costs for Hurricane Florence repairs that "d[id] not appear to have been made." The court determined that it could not "provide any credit to [Wife] for her alleged 'reimbursements' to the Denison Cronk . . . account based upon the evidence [she] presented."

Wife does not challenge findings 15(a) through 15(d) or finding 15(f), which are therefore binding on appeal. *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903. Her challenge is narrow: she contests only finding 15(e)'s characterization of the $101,767.92 difference as "proceeds [she] retained." In Wife's view, the funds "went into the McKenzie account, which was ultimately distributed equally to both parties," so the court erred by treating Denison Cronk as Husband's "alter ego" and McKenzie Cronk as hers—"where funds withheld from Denison were somehow funds withheld from [Husband]."

Wife's argument fails for the same reason her challenge to finding 14 fails: it conflates distinct assets in the equitable distribution ledger. The Denison and McKenzie accounts were marital property, valued at the date of separation—a snapshot of each account's balance at that time. *See* N.C. Gen. Stat. § 50-21(b) ("[M]arital property shall be valued as of the date of the separation of the parties[.]").

By contrast, the $101,767.92 in diverted South Shore rental proceeds was divisible property, valued at the date of distribution. *See id.* ("Divisible property and divisible debt shall be valued as of the date of distribution."). Finding 15 captures those postseparation diverted rental proceeds—property that the distribution of the marital accounts did not (and could not) account for.

Nor was the trial court required to find a direct withdrawal to a personal account before concluding that Wife "retained" the proceeds. The unchallenged findings show that Wife unilaterally redirected the South Shore rental proceeds to the McKenzie account, admitted the Denison account lacked sufficient funds to cover property costs, and refused Husband's repeated requests to transfer the money back. She then closed the Denison account in December 2019 with only $958.45 remaining—after a year in which over $70,000 came in—and endorsed the final balance to herself.

Wife's testimony at trial did not help her. At first, she testified that she had "never received any" Denison Cronk rental income, then admitted on cross-examination that she received "a large portion of the rental income" from the South Shore property into the McKenzie account in 2018 and 2019 before "put[ting] [it] back into the Denison" account. Her explanation for redirecting the deposits—that she was "busy running the putt" and thought a single bank statement would be "much easier for [her] to manage"—did not explain why she repeatedly refused to transfer

the funds back when Husband asked. And her claimed reimbursements fell apart on cross-examination: at least one deposit she counted as a transfer to Denison actually went into McKenzie; she could not confirm that other claimed transfers reached Denison; she included Lowe's receipts for the Oleander Drive property—again, costs already recouped through its sale; and she admitted that expenses for "Go Gas, Mission Barbeque, Speedway Gas, Mission Barbeque, [unintelligible] Mart, and Burger King" were "for [her]self."

The trial court heard competing versions of where the South Shore rental proceeds went. Husband claimed that Wife diverted and retained them; Wife maintained that all the VRBO deposits benefited Denison Cronk and that McKenzie Cronk transferred more back to Denison than it ever received. The court resolved that dispute against her. We do not disturb that determination. *See Williamson*, 217 N.C. App. at 392, 719 S.E.2d at 628. Competent evidence supports the finding that Wife "retained" the proceeds, no matter which marital account they passed through. *See Asare*, 281 N.C. App. at 236, 869 S.E.2d at 20. The court did not abuse its discretion in distributing those funds to her. *See Stovall*, 205 N.C. App. at 407, 698 S.E.2d at 683.

In sum, competent evidence supports the trial court's findings on each of the marital and divisible assets and liabilities addressed in Wife's first four issues. *See Asare*, 281 N.C. App. at 236, 869 S.E.2d at 20. The court heard conflicting testimony,

made credibility determinations, and weighed the evidence in making its findings—none of which is ours to second-guess on appeal. *See Williamson*, 217 N.C. App. at 392, 719 S.E.2d at 628.

### C. Patio Playground's Goodwill

In calculating McKenzie Cronk's income from 2017 to 2022, the trial court found that Patio Playground's revenue had grown steadily over the marriage—growth tied, in part, to "goodwill" the parties built with local residents and repeat vacationers. That goodwill accounted for "at least 25% of the business income." The court classified that income as "passive income and distributable as a divisible asset of the parties' marriage."

Wife argues that the trial court "erred in distributing 25% of . . . Patio Playground['s] income as divisible property attributable to goodwill." Husband, she asserts, "presented no evidence of any goodwill in the business," and "the 25% figure is entirely unsubstantiated."

But Wife cites no legal authority in support of that argument. Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure requires that the "body of the argument . . . contain citations of the authorities upon which the appellant relies." N.C. R. App. P. 28(b)(6). It is not this Court's "role. . . to create an appeal for an appellant," or "to supplement an appellant's brief with legal authority" she failed to include. *Kabasan v. Kabasan*, 257 N.C. App. 436, 443, 810 S.E.2d 691, 697 (2018)

(citation omitted). Because Wife cites no legal authority, her arguments are abandoned, and we do not address them.

**D. Carmel Trail, Page Avenue, and South Shore Drive Properties**

Wife's next three issues concern the trial court's treatment of three real properties distributed to Husband: the Carmel Trail home (the former marital home), the Page Avenue property, and the South Shore Drive property. Her briefing on these issues is unclear. But as best we can tell, Wife's core contention across all three properties is the same: that the trial court calculated the divisible value based only on postseparation market appreciation without separately accounting for concurrent reductions in mortgage principal. On Carmel Trail, she presses two related arguments about the HELOC—that the court failed to distribute the postseparation decrease in HELOC principal as divisible property, and that it wrongly credited Husband for $83,000 in postseparation interest payments.

As we explain below, most of Wife's arguments turn on values and distributions to which the parties themselves stipulated in the final pretrial order—which she cannot now ignore. Her challenge to the distribution of Husband's HELOC interest payments stands on different footing but fails all the same. We outline the relevant law, describe the pertinent stipulations and findings, and then examine her arguments on each property.

   *1. Relevant Law*

"Under North Carolina General Statute Section 50-20(c), equitable distribution is a three-step process: the trial court must (1) classify property as being marital, divisible, or separate property; (2) calculate the net value of the marital and divisible property; and (3) distribute equitably the marital and divisible property." *Asare*, 281 N.C. App. at 239, 869 S.E.2d at 22 (citation omitted). The court calculates the marital property's net value at "the date of the parties' separation." *Clemons v. Clemons*, 265 N.C. App. 113, 115, 828 S.E.2d 501, 504 (2019) (citation omitted); *see also* N.C. Gen. Stat. § 50-21(b) ("[M]arital property shall be valued as of the date of the separation of the parties."). It assesses "[d]ivisible property and divisible debt" at "the date of distribution." N.C. Gen. Stat. § 50-21(b). And "[i]n determining the value of the property, the trial court must consider the property's market value, if any, less the amount of any encumbrance serving to offset or reduce the market value." *Robinson*, 210 N.C. App. at 323, 707 S.E.2d at 789 (citation omitted).

Parties may, however, simplify this process by stipulating to an asset's classification, valuation, and distribution. *Zurosky v. Shaffer*, 236 N.C. App. 219, 236, 763 S.E.2d 755, 765 (2014). A stipulation is a "judicial admission" that courts "recognize and enforce as a substitute for legal proof." *Quesinberry v. Quesinberry*, 210 N.C. App. 578, 582, 709 S.E.2d 367, 371 (2011) (citations omitted). And "in equitable distribution cases, stipulations in the pretrial order are intended to limit

the evidence needed" and "define the issues the trial court must decide." *Clemons*,

265 N.C. App. at 117, 828 S.E.2d at 505 (citation omitted).

Stipulations are "binding in every sense." *Young v. Young*, 133 N.C. App. 332,

515 S.E.2d 478 (1999) (citation omitted). The party who makes a stipulation is

"prevent[ed] . . . from introducing evidence to dispute it, and reliev[ed] . . . from the

necessity of producing evidence to establish the admitted fact." *Id.* (citation and

brackets omitted). And a stipulation binding at trial is binding on appeal—parties

may not "enter into stipulations for trial purposes, then abandon those agreements

and chart a different course when they sail into appellate waters." *Wall v. Wall*, 140

N.C. App. 303, 310-11, 536 S.E.2d 647, 652 (2000) (citation omitted). Neither party

here moved to set aside any stipulation, and the trial court did not do so on its own

motion. *See Clemons*, 265 N.C. App. at 120, 828 S.E.2d at 506.

### 2. Final Pretrial Order

On 20 October 2022, the parties entered a final pretrial order, signed by both

sides and their counsel. The order provided, in relevant part:

> 4. Exhibit A reflects the parties' contentions as to the
> content, value[,] and proposed distribution of the marital
> estate. Where agreement appears as to classification,
> value[,] and distribution, no further evidence is required
> with respect to said issues.
> . . . .
>
> 7. [Wife] and [Husband] contend that the contested issues
> to be tried by the court are as follows:

. . . .

> B. The value of the marital and divisible property
> shown on [Exhibit] A that have not been agreed
> upon[.]

Exhibit A set out each party's proposed value for every asset and liability in the marital estate, with matching figures reflecting "agreement." For each of the three properties at issue—Carmel Trail, Page Avenue, and South Shore Drive—both parties listed identical figures, including market values, mortgage balances, net marital values, and net divisible values. The properties' divisible values were thus not among the contested issues.

### 3. Trial Court's Findings

The trial court adopted the parties' stipulated values. In finding 11, it found, in pertinent part:

> 11. The parties have stipulated to the following with regard
> to the marital estate and the [c]ourt finds [and] accepts
> their stipulations and makes the following findings of fact
> with regard to their marital property and the fair market
> value as of the date of separation and date of trial:

| # | REAL PROPERTY | FMV DOS | FMV DOT | TO |
|---|---|---|---|---|
| 1 | [Carmel Trail property] | $630,000.00 | $892,000.00 | H |
|  | (Less [Wells Fargo] Mortgage with SECU) | ($232,011.65) | ($167,011.18) | |
|  | (Less HELOC with PNC) | ($302,625.00) | ($302,625.00) | |
|  | Net Marital Value | $95,363.35 | $95,363.35 | |
|  | Net Divisible Value | | $262,000.00 | |
| 2 | [Page Avenue property] | $158,000.00 | $273,000.00 | Disputed |
|  | (Less Mortgage with OCWEN) | ($142,608.13) | ($115,167.84) | |
|  | Net Marital Value | $15,391.87 | $15,391.87 | |
|  | Net Divisible Value | | $115,000.00 | |

| . . . | . . . | . . . | . . . | . . . |
|---|---|---|---|---|
| 5 | [South Shore Drive property] (Less Mortgage with SunTrust) Net Marital Value Net Divisible Value | $687,000.00 ($410,567.23) $276,432.77 | $995,000.00 ($369,219.72) $625,780.28 $308,000.00 | H |

. . . .

| # | DIVISIBLE LIABILITIES | FMV DOT |
|---|---|---|
| 32[13] | Post-DOS Interest (HELOC) | ($83,000.00) |

An attached spreadsheet, incorporated by reference in the decretal section's first paragraph, mirrors these values and distributions.

For Page Avenue, the trial court made additional findings outside the chart in finding 4: "The parties have stipulated to the value of the property but disagree as to the distribution of the property." Because Denison Cronk managed the property and Husband had managed Denison Cronk since 2019, the court distributed the property to Husband at the stipulated value.

### a. Carmel Trail Property[14]

---

[13] The listing of this property as "#32" appears to be a clerical error; both Exhibit A of the final pretrial order and the spreadsheet attached to the court's order list it as "#33."

[14] In this part of her argument, Wife cites *Martin v. Martin*, 202 N.C. App. 584, 691 S.E.2d 133, 2010 WL 520997, at *1 (2010) (unpublished), for the proposition that a court errs when it does not classify postseparation reductions "in the principal owed on marital debt as divisible property." She fails to note that *Martin* is unpublished and thus non-precedential, as our Rules of Appellate Procedure require. *See* N.C. R. App. P. 30(e)(3) ("When citing an unpublished opinion, a party must indicate the opinion's unpublished status."). In any event, *Martin* is inapt. Whatever else may be said about the

Wife claims that the trial court failed to "categorize" the $65,000.47 "reduction in the Wells Fargo mortgage [balance] as divisible property." In her view, the court's order "contradicts itself"—noting the mortgage reduction in one place while "calculating the home's total value . . . based only on the market price" in another. The result, she argues, is that Husband "effectively received" the Carmel Trail property "at a much lower value than it was actually worth." We disagree in every respect.

A party cannot stipulate to a value in a pretrial order and then argue on appeal that the court erred by using it. *See, e.g.*, *Wall*, 140 N.C. App. at 310-11, 536 S.E.2d at 652 ("Parties are not free to enter into stipulations for the purposes of trial, then abandon those agreements and chart a different course when they sail into appellate waters." (citation omitted)); *Clemons*, 265 N.C. App. at 117, 828 S.E.2d at 505 ("It is well-established that stipulations in a pretrial order are binding upon the parties and upon the trial court."). That's what Wife attempts here.

In Exhibit A, both parties listed the same figures for the Carmel Trail property: a market value of $630,000 at separation and $892,000 at distribution; a Wells Fargo mortgage of ($232,011.65) at separation and ($167,011.18) at distribution; a HELOC

---

differences between that case and this one, no party in *Martin* had stipulated to the divisible value at issue. There, the trial court independently calculated the divisible value of the marital residence and excluded the mortgage principal reduction from that calculation. *Martin*, 2010 WL 520997, at *3. That is not what happened here.

balance of ($302,625.00) at both dates; a net marital value of $95,363.35; and a divisible value of $262,000, distributed to Husband. The $65,000.47 mortgage paydown appeared in both columns, yet the parties assigned a divisible value of $262,000—a figure that captures only the change in market value ($892,000 minus $630,000) and does not separately account for the mortgage reduction. Wife acknowledged as much in her reply brief: "The mortgage balance figures . . . were settled by stipulation in the pretrial order." They were. And the divisible value was likewise stipulated. So the trial court did not abuse its discretion in adopting it. *See Quesinberry*, 210 N.C. App. at 584, 709 S.E.2d at 373 (holding "that the trial court did not abuse its discretion by valuing the account at the amount stipulated by both parties in the [p]re–[t]rial [o]rder").

Wife's argument on the HELOC principal fails for the same reason. She contends that a statement Husband introduced at trial showed the HELOC balance had dropped to $192,771.00 by the time of the hearing—a reduction that, Wife says, created an additional $109,854 in home equity that the court should have classified as divisible property. By "failing to identify and distribute this divisible property," she asserts, "the court effectively gifted this equity to [Husband] alone when he received the house."

But in Exhibit A, Wife listed the HELOC balance at ($302,625.00) for both dates, and Husband's column reflected the same figure. Neither party identified any

change in the HELOC balance or claimed any additional divisible value from a reduction in principal. True, Husband introduced a HELOC statement at trial reflecting a lower balance. But that inconsistent evidence does not undo a stipulation—and neither Wife nor the trial court took any action to set the stipulation aside. *See generally Smith v. Smith*, 387 N.C. 255, 259, 912 S.E.2d 762, 765 (2025) (summarizing "the procedural and substantive principles that govern the setting aside of stipulations" (citing *Lowery v. Locklear Constr.*, 132 N.C. App. 510, 513-14, 512 S.E.2d 477 (1999)). "While a stipulation remains in place, the parties are 'bound by it and . . . may not thereafter take an inconsistent position.' " *Id.* (citation omitted). The court adopted the figures both parties stipulated and thus did not abuse its discretion. *See Quesinberry*, 210 N.C. App. at 584, 709 S.E.2d at 373.

Finally, Wife challenges the trial court's treatment of Husband's postseparation HELOC interest payments. Wife offered no contention on this property in Exhibit A. The spreadsheet attached to the order listed "Post-DOS Interest On HELOC" as a "divisible liabilit[y]" valued at negative $83,000 and distributed to Husband.

Wife does not contest this debt's classification as divisible or the $83,000 figure itself—and for good reason. Both spouses identified the payments at trial: Husband testified that he made the interest-only payments on the HELOC totaling $95,420.20 after the date of separation. Wife corroborated that amount on direct examination—

she agreed that of the $95,000 Husband paid, about $12,000 came from the McKenzie Cronk account, and asked the court to "adjust the $95,000 number down by $12,000." Husband's counsel soon confirmed the resulting $83,000 on the record, and Wife's counsel did not object:

> [Husband's Counsel:] So you agree with [Wife] at this point the $83,000 is what should be attributed to you as payment of interest on the HELOC?
>
> [Husband:] Yes.

Wife concedes as much on appeal, noting that she "does not contest that $95,420.20 in total payments were made, nor that $83,000 of those payments were from sources other than the McKenzie Cronk account." So competent evidence supports the trial court's classification and valuation, and those findings are binding on appeal. *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903.

Wife contests only the trial court's distribution. She argues that Husband failed to prove the payments came from his separate funds, and that the court therefore erred by distributing the liability to him—"effectively crediting" him for payments made with marital money. To support that argument, she invokes what she calls a "general presumption" that postseparation payments toward marital debt are presumed to come from "marital" funds, citing *Klein*. *See id*. Absent proof that payments came from separate funds, she maintains, "those payments are not credited to that party."

Wife's misreads *Klein*. There, the husband paid a marital tax liability from his SECU account and then sought credit, claiming that the lawsuit proceeds in the account were his separate property. *Id.* at 589-90, 892 S.E.2d at 910. They were not; the trial court had already classified those proceeds as marital funds. *Id.* Because the husband paid a marital debt with marital money, his request for credit was "without merit." *Id.* at 590, 892 S.E.2d at 910 (citing *Bodie v. Bodie*, 221 N.C. App. 29, 34, 727 S.E.2d 11, 15 (2012)). The case we cited clarified why: "A spouse is entitled to some consideration for any post-separation payments made by that spouse (from non-marital or separate funds) for the benefit of the marital estate." *Bodie*, 221 N.C. App. at 34, 727 S.E.2d at 15 (citation omitted). *Klein* applied that rule. It did not create a presumption that all postseparation payments toward marital debt come from marital funds.

Here, no one has classified the sources of Husband's $83,000 in payments as marital—and Wife points to no evidence that they were. To the contrary, she agrees that the $83,000 came from sources other than the McKenzie Cronk account. The trial court distributed the liability to Husband, the spouse who made the payments and received the property encumbered by the HELOC. That allocation makes sense: Husband lived in the Carmel Trail home after separation, made the interest payments, and received the property in the final distribution. *See Adams*, 331 N.C. at 694, 417 S.E.2d at 453 (approving allocation of marital debt to husband as a

method of "credit[ing]" him for paying the debt during separation). The trial court did not abuse its discretion. *Id.* at 691, 417 S.E.2d at 451.

### b. Page Avenue Property

Wife repeats the same argument for the Page Avenue property: that the trial court's divisible value of $115,000 captures only market appreciation ($273,000 minus $158,000) and ignores the $27,440.29 mortgage paydown.

Once again, Wife stipulated to the figures she now contests. In Exhibit A, both parties listed the same figures for this property: a market value of $158,000 at separation and $273,000 at distribution; a mortgage balance of ($142,608.13) at separation and ($115,167.84) at distribution; and a divisible value of $115,000. The mortgage paydown was visible in both columns—and both parties still computed a divisible value of $115,000. The trial court confirmed that the parties stipulated to the property's value but disagreed on its distribution. Because Denison Cronk managed the property and Husband had managed Denison Cronk since 2019, the court distributed Page Avenue to Husband at the stipulated value. Wife may not stipulate to that value before trial and then reject it on appeal. *Wall*, 140 N.C. App. at 310-11, 536 S.E.2d at 652. The trial court did not abuse its discretion. *See Quesinberry*, 210 N.C. App. at 584, 709 S.E.2d at 373.

### c. South Shore Drive Property

Wife's challenge to the South Shore property is the same. She contends that the trial court's divisible value of $308,000 captures only market appreciation ($995,000 minus $687,000) without accounting for the $41,347.51 mortgage paydown.

The same analysis applies—here, though, the parties stipulated not only to the values but also to the distribution. In Exhibit A, both Wife and Husband listed the same market values ($687,000 at separation and $995,000 at distribution), the same mortgage balances ($410,567.23 and $369,219.72), and the same divisible value of $308,000, distributed to Husband. The mortgage paydown was clear in both columns. The trial court adopted the figure both parties agreed to, and Wife may not challenge it now. *Wall*, 140 N.C. App. at 310-11, 536 S.E.2d at 652. The trial court did not abuse its discretion. *See Quesinberry*, 210 N.C. App. at 584, 709 S.E.2d at 373.

## E. Husband's IRA/401k Account

Wife's next issue concerns the trial court's valuation of Husband's IRA/401K Morgan Stanley account. The parties stipulated that the account was worth $166,442 at the date of separation. The trial court found that they "disagree[d] as to the [asset's] distribution," and ultimately distributed the account to Husband "as his sole and separate property in consideration of the overall distribution of the parties' marital and divisible property."

Wife argues that the trial court "erred in distributing only the marital component at the date of separation value, without also distributing the divisible

component at the date of distribution." She notes that Husband testified at trial that the account's total balance was $225,000 and contends that "[t]he most straightforward explanation" for the roughly $59,000 difference is that "the account appreciated over those five years." That appreciation, she maintains, "is presumed to be divisible property" that the court had to distribute.

The sole evidence of the account's value at trial came from Husband's cross-examination testimony. When asked about the current balance, Husband initially responded that the $166,000 was how much the account had "increase[d] since the day [the parties] were married." After his counsel clarified the question, Husband confirmed that the total balance was $225,000. No other evidence about the account was introduced.

Wife's argument rests on the assumption that the difference between $166,442 and $225,000 reflects passive postseparation appreciation. *See* N.C. Gen. Stat. § 50-20(b)(1a)(a) (2023) (defining divisible property to include post-separation appreciation of marital property but excluding appreciation resulting from a spouse's post-separation actions). But nothing in the record supports that assumption. Husband's testimony revealed only two figures: the stipulated date-of-separation value and the account's balance at trial. It shed no light on whether the change resulted from passive market gains, post-separation contributions, or some combination of those forces. Indeed, what evidence the record does contain suggests

a more complicated picture than Wife acknowledges: Husband testified that he was taking annual distributions from the account, with a 2018 Morgan Stanley statement showing a $27,000 distribution that year alone. Absent either appreciation or additional contributions, those withdrawals should have driven the balance *down*— yet no evidence shows whether appreciation, contributions, or some other source offset those withdrawals to produce the higher balance.

Wife asks this Court to fill that evidentiary gap by adopting what she calls the "most straightforward explanation" for the difference in values. But the trial court was under no obligation to speculate about what caused the change in value when no evidence explained it. *See Miller v. Miller*, 97 N.C. App. 77, 80, 387 S.E.2d 181, 184 (1990) (noting that the requirements to classify, value, and distribute marital and divisible property "necessarily exist only when evidence is presented to the trial court which supports the claimed classification, valuation[,] and distribution"). The court valued the IRA/401k at the amount the parties stipulated and distributed it accordingly. It did not abuse its discretion in doing so.[15] *See Quesinberry*, 210 N.C. App. at 584, 709 S.E.2d at 373 (holding that the trial court "did not abuse its discretion by valuing the account at the amount stipulated by both parties").

---

[15] Wife raises additional arguments about Husband's post-separation withdrawals from the account and their proper treatment on remand. Because those arguments rest on the same premise—that the trial court was required to distribute the postseparation change in value as divisible property—and we have concluded that it was not, we decline to address them.

## F. Camaro

Wife's next argument concerns the 2016 Chevrolet Camaro. The parties agreed the vehicle should be distributed to Husband but disputed its value—Wife at $22,000 based on Kelly Blue Book, Husband at $8,000. The trial court found that the Camaro "was declared a total loss shortly following the separation of the parties" and that, "[a]fter satisfying the loan encumbering the vehicle, [Husband] received insurance proceeds in the amount of $8,000[ ] representing [his] equity in the vehicle." It valued the Camaro at $8,000 and distributed it to Husband.

Wife argues that figure "was unsupported by the evidence." It was not. The trial court had to determine "the net value of the marital property" at "the date of the parties' separation, with net value being market value, if any, less the amount of any encumbrances." *Clemons*, 265 N.C. App. at 115, 828 S.E.2d at 504 (citation omitted). That is what the $8,000 figure represents. Because the Camaro was totaled shortly after separation, the insurance payout made directly to Husband—based on the car's market value before it was totaled minus the outstanding lien—is competent evidence of its net value at the date of separation. Husband testified that the Camaro carried a lien at separation; that the car was totaled in the early summer of 2018; and that after the insurance company satisfied the lien, he received $8,000 in proceeds—"the value of the car less the lien." A bank statement for the parties' joint account, which

was admitted at trial (without objection), corroborated that testimony, showing an $8,000 deposit on 19 July 2018.

Wife's Kelly Blue Book estimate does not help her. That $22,000 figure reflected only gross value—it did not account for the Camaro's lien. Wife conceded as much on cross-examination, stating that she had not accounted for the lien and did not know one existed. A valuation that ignores an outstanding encumbrance is not evidence of net value. The trial court's findings are supported by competent evidence, *see Asare*, 281 N.C. App. at 236, 869 S.E.2d at 20, and it did not abuse its discretion. *See Pellom v. Pellom*, 194 N.C. App. 57, 62, 669 S.E.2d 323, 325 (2008) ("[T]his Court will not second-guess values of marital . . . property where there is evidence to support the trial court's figures." (cleaned up)).

## III. Sanctions

Wife's next challenge targets the trial court's imposition of sanctions under Section 50-21(e). *See* N.C. Gen. Stat. § 50-21(e) (allowing the court, "upon [its] own initiative," to "impose an appropriate sanction on a party when the court finds that" certain criteria are met).

The trial court found that "[t]hroughout the course of this litigation," Wife had "willfully obstructed and unreasonably delayed" the proceedings. Specifically, she refused to provide discovery responses "on several occasions," forcing Husband to file multiple motions to compel; testified under oath "that she did not have access to such

documents or that the requested documents did not exist," only to acknowledge their existence at trial; provided "extremely deficient" discovery responses, repeatedly "claim[ing]" she had already given Husband "the requested documents"; attempted to introduce at trial documents she had refused to produce in discovery; and turned over a hard drive that appeared to have been "clean[ed]" before it reached Husband's counsel. As a result, the court found, Husband "was extremely prejudiced in his ability to fully prepare for trial," "incurred substantial costs" trying to compel Wife's compliance, and was "forced to retain experts to locate the missing information [Wife] refused to provide"—all of which "unreasonably delayed" the trial.

Based on these findings and others, the trial court concluded that Wife acted "knowingly and voluntarily to conceal income for the Patio Playground and in an effort to conceal potential insurance fraud engaged in by [her] and [Hanna]." On its own motion, the court sanctioned Wife under Section 50-21(e), ordering her to pay the $34,437.50 Husband incurred for his forensic accountant expert. *See id.*

Wife raises two objections, both drawn from *Zaliagiris v. Zaliagiris*, 164 N.C. App. 602, 596 S.E.2d 285 (2004). The first: Husband's expert never appeared pursuant to a subpoena. The second: she received no notice that sanctions could be imposed. Neither holds up.

This Court has

> held that whether to impose sanctions and which sanctions
> to impose under [Section] 50-21(e) are decisions vested in

the trial court and reviewable on appeal for abuse of discretion. . . . In applying an abuse of discretion standard, this Court will uphold a trial court's order of sanctions under [S]ection 50–21(e) unless it is manifestly unsupported by reason.

*Dalgewicz v. Dalgewicz*, 167 N.C. App. 412, 425, 606 S.E.2d 164, 172 (2004) (internal citations and quotation marks omitted).

Section 50-21(e) directs a court, "upon [its] own initiative," to sanction a party who has "willfully obstructed or unreasonably delayed, . . . discovery proceedings . . . or . . . any pending equitable distribution proceeding" when that obstruction "is or would be prejudicial to the interests of the opposing party." N.C. Gen. Stat. § 50-21(e). The available sanctions include "an order to pay the other party the amount of the reasonable expenses and damages incurred because of the willful obstruction or unreasonable delay." *Id.* The court may also appoint, "at the offending party's expense," an "accountant, appraiser, or other expert whose services the court finds are necessary." *Id.*

Wife reads *Zaliagiris* to impose a subpoena requirement on Section 50-21(e) sanctions. It does not. In *Zaliagiris*, the parties disputed the value of the husband's 25% share in a business, so each called competing experts at trial. *Id.* at 604, 596 S.E.2d at 287. The trial court initially ordered the husband to reimburse the wife for her expert's fee as a court cost. *Id.* During a hearing on the husband's motion to reconsider, "it was pointed out to the trial court" that the wife's expert had not

testified pursuant to a subpoena, and thus the court announced *sua sponte* that the fees would instead be assessed as a Rule 11 sanction. *Id.* at 605, 596 S.E.2d at 288; *see also* N.C. Gen. Stat. § 1A–1, Rule 11 (2023) (allowing trial courts to impose sanctions, including reasonable attorney's fees, for improper filing of frivolous pleadings, motions, or other papers). The wife's counsel then suggested Section 50-21(e) as the appropriate vehicle "for sanctioning [the husband]." *Id.* In its amended order, the court found that the husband's refusal to accept the wife's business valuation constituted "willful obstruction and unnecessary delay of the proceedings." *Id.* at 605, 596 S.E.2d at 288. The court sanctioned him under both Rule 11 and Section 50-21(e), requiring him to pay the wife's expert's fees and related attorney's fees. *Id.* at 605-06, 596 S.E.2d at 288.

This Court reversed. *Id.* at 609-10, 596 S.E.2d at 290-91. The Rule 11 sanction, we explained, failed "as a matter of law because the sanction[ ] . . . had nothing to do with the improper signing or filing of documents with the court." *Id.* at 608 n.4, 596 S.E.2d at 290 n.4 (citation omitted). The initial "court cost" assessment was "clearly impermissible" too: A "trial court may not assess expert witness fees against a party as costs, unless the expert's appearance is pursuant to a subpoena." *Id.* at 609, 608, 596 S.E.2d at 290 (citing *Rogers v. Sportsworld of Rocky Mount, Inc.*, 134 N.C. App. 709, 713, 518 S.E.2d 551, 554 (1999)). And the Section 50-21(e) sanction failed not because of the missing subpoena, but because the husband "was given no due process

notice that he would be subject to the imposition of sanctions upon reconsideration"—he had notice only that the cost assessment would be reconsidered, "not that sanctions would be imposed as an alternative." *Id.* at 609, 596 S.E.2d at 290. This Court expressly declined to reach whether the Section 50-21(e) sanction would have been permissible with proper notice. *Id.* at 609 n.5, 596 S.E.2d at 290-91 n.5.

Our discussion in *Zaliagiris* clarified that the subpoena requirement arises from the cost statutes—not from Section 50-21(e). *See id.* at 609, 608, 596 S.E.2d at 290 (citing *Rogers*, 134 N.C. App. at 713, 518 S.E.2d at 554); *see also Rogers*, 134 N.C. App. at 713, 518 S.E.2d at 554 ("A trial court may only award costs in accordance with statutory authority. . . . The statutes governing the assessment of costs are North Carolina General Statutes [S]ections 6-20 . . . and 7A–314[.]" (citation omitted)). Here, the trial court did not assess expert fees as costs. It imposed sanctions under Section 50-21(e) based on detailed findings that Wife willfully obstructed the proceedings, and she does not challenge these findings on appeal. Because Section 50-21(e) contains no subpoena requirement, it is irrelevant that Husband's expert did not testify pursuant to a subpoena.

And Wife's notice argument is no more persuasive. She contends that, like the husband in *Zaliagiris*, she received no notice that sanctions could be imposed. *See Zaliagiris*, 164 N.C. App. at 609, 596 S.E.2d at 290. The record says otherwise.

In finding 27, the trial court found that before hiring the forensic accountant expert, Husband moved for the court to appoint an expert to evaluate McKenzie Cronk's income and to split the expert's fee equally between the parties. Wife opposed both the appointment and fee-splitting at the 7 February 2022 hearing on Husband's motion. The court denied the motion but "stated on the record and to both parties that, should the expert discover that substantial income was underreported or not reported, the [c]ourt could consider the apportionment of costs of the expert at [a] future hearing." The expert discovered exactly that, and the trial court so found.

Wife disputes that the court ever made this statement and notes that the written order on Husband's motion contains no mention of it. But Wife did not include a transcript of the 7 February hearing in the record on appeal—and as the appellant, the burden was hers. *See Fox v. Fox*, 283 N.C. App. 336, 354-55, 873 S.E.2d 653, 667 (2022) ("[U]nder North Carolina Rules of Appellate Procedure 7, 9, and 11, the burden is placed upon the appellant to commence settlement of the record on appeal, including providing a verbatim transcript if available." (citation omitted)). Without that transcript, we cannot conclude that the court erred in finding it gave both parties notice that expert fees could be revisited.

That dooms Wife's *Zaliagiris* analogy. The husband there had notice only that an improper cost assessment would be reconsidered—not that sanctions would be imposed as an alternative. *See Zaliagiris*, 164 N.C. App. at 609, 596 S.E.2d at 290.

Wife, however, had notice of something far more specific: that if income was found to be underreported, she could have to bear the cost of the expert retained to uncover it. The trial court did not abuse its discretion in imposing sanctions under Section 50-21(e). *See Dalgewicz*, 167 N.C. App. at 425, 606 S.E.2d at 172.

## IV. Child Support

Finally, Wife challenges the trial court's finding on Husband's gross monthly income. The court found, in relevant part:

> 31. After the parties separated in July 2017, the parties' then minor children continued to reside with [Husband] primarily. The eldest children . . . both had reached the age of majority and graduated from high school or an equivalent program as of June 2019 and the youngest child . . . reached the age of majority in October 2020. [Wife] does not currently have a relationship with [the youngest child]. Following [that child's] graduation from high school, and prior to her attainment of the age of majority, she resided in an apartment downtown while attending Cape Fear Community College. [Husband] continued to pay her living expenses while she attended . . . college through her eighteenth . . . birthday. [Wife] did not contribute to these expenses and had little contact with [her] during this period.
>
> 32. Following the separation of the parties, [Wife] owed a duty of support for the parties' children to [Husband] pursuant to North Carolina law under . . . Worksheet A of the North Carolina Guidelines for child support.
>
> 33. From the date of separation of the parties through October 2020, [Wife] failed to pay any child support to [Husband] for the use and benefit of the parties' minor children. This includes the period following [Husband's] filing of his claim for child support on [26 March] 2019.

Following the filing of his claim, [Wife] continued to refuse to provide adequate support for the parties' then minor children.

34. [Wife] is employed as the owner and operator of the Patio Playground. [She] did not provide any evidence to assert her personal income for this period. Based upon the evidence presented by [Husband], which is the only evidence the [c]ourt received, the [c]ourt finds [Wife's] average annual income for the years 2018 through 2020 . . . (2017 is calculated using the same method, below) to be as follows:

   a. 2017: $148,898.05

   b. 2018: $161,458.42

   c. 2019: $148,800.59

   d. 2020: $59,842.00

Thus, [Wife's] average gross monthly income is $10,812.48 for the years 2017–2020.

. . . .

35. [Husband] is a retired attorney, having worked as General Counsel for General Electric for over forty . . . years prior to his retirement. He currently receives social security of approximately $2,771.00 per month; mandatory 401k withdrawals in the amount of $2,285.08 per month; and pension benefits in the amount of $5,605.76 per month for a total gross monthly income of $10,661.84 per month.

. . . .

37. Based upon [Wife's] refusal to provide support for the use and benefit of the parties' children, including the period following [Husband's] filing of his claim for child support, both retroactive and prospective child support . . . are reasonable and necessary in this case.

38. Pursuant to Worksheet A of the North Carolina Guidelines for Child Support, for the period of [1 August 2017] through June 2019 (23 months), [Wife] owed child support to [Husband] in the amount of $1,796.00 per month for a total support amount of $41,308.00. For the period of July 2019 through October 2020 (16 months), [Wife] owed child support to [Husband] in the amount of $1,079.00 per month for total support amount owed of $17,264.00 for this period.

39. [Wife] owes retroactive and prospective child support . . . to [Husband] in the amount of $58,572.00.

The court ordered Wife to pay retroactive and past-prospective child support to Husband "in the amount of $58,572.00," payable at $1,500 per month beginning 1 January 2023.

Wife argues that two of the three figures the trial court used for Husband's income in finding 35—his social security and his 401k withdrawals—are unsupported by the evidence. Both figures, Wife says, "had no basis in any testimony or any exhibit." We agree.[16]

Child support orders are "accorded substantial deference by appellate courts and our review is limited to a determination of whether there was a clear abuse of discretion." *Eidson v. Kakouras*, 286 N.C. App. 388, 399, 880 S.E.2d 760, 769 (citation

---

[16] Wife also raises Patio Playground's "goodwill" income in this section of her brief, noting that the trial court listed her income in finding 34 for 2018 through 2020 using the same figures it found as Patio Playground's "total income" in finding 19. Because we have already held that Wife waived her challenge to Patio Playground's goodwill, and so do not disturb the court's findings on that point, we need not address this argument.

omitted). The trial court "must make specific findings and conclusions" in a child support case. *Id.* Those findings "must be supported by competent evidence," they "must support the conclusions, and the conclusions must support the judgment." *Id.* Further, "determinations of gross income are conclusions of law," which we review *de novo. Thomas v. Burgett,* 265 N.C. App. 364, 367, 852 S.E.2d 353, 356 (2019) (citation omitted).

The trial court found that Husband "receive[d] social security of approximately $2,771.00 per month" and "mandatory 401k withdrawals in the amount of $2,285.08 per month." The record does not support either figure. On social security, the only evidence was Husband's testimony that he received "about $2,700" per month. No document or other testimony corroborated that approximation, and the figure the court found—$2,771—does not even match the number Husband gave. The 401k finding rests on even less. Husband testified that he took out mandatory annual withdrawals but could not remember the amount:

> [Husband's counsel:] . . . [Y]ou also take a distribution from your 401K; is that accurate?
>
> [Husband:] Yes.
>
> [Husband's counsel:] Okay. And how much do you take from your 401K a year?
>
> [Husband:] There's a percentage calculation that has to be done, and I can't remember what it is. But every year there's a mandatory withdrawal.

The trial court found a precise figure of $2,285.08. Nothing in the record tells us where that number came from.

The transcript suggests a possible source. Husband's counsel referenced financial documents regarding Husband's pension that were labeled as Exhibit 45C. And the exhibit log lists several documents under Exhibit 45 that might bear on these findings:

| [#] | **EXHIBIT 45** | [Admitted] |
|-----|----------------|------------|
| A | SSA Income | |
| B | 401K Income | |
| C | Pension Income | |
| . . . | . . . | . . . |

But the transcript does not show that Husband's counsel moved to admit Exhibit 45A, 45B, or 45C at trial, and none of those exhibits are in our record. We have no way of knowing what they contain—and on appellate review, we can consider only what is before us. We also appreciate that the trial court may have relied on Husband's financial affidavit, since New Hanover County's Local Rule 11.1.1. requires each party in a child support case to "complete and exchange" a financial affidavit "by the

date of the hearing."[17]   Fifth Judicial District Local Rules 11.1.1.   But again, our record contains no financial affidavits for either party.

Because no evidence in the record supports the trial court's findings on Husband's social security income and 401k withdrawals, we vacate that portion of finding 35 and remand.  *See Gavia v. Gavia*, 289 N.C. App. 491, 495, 890 S.E.2d 531, 535 (2023) (vacating and remanding child support order where the record contained no evidence to support the trial court's findings on the parties' incomes).  "On remand, the trial court, in its discretion, may enter a new order based on the existing record, or may conduct further proceedings including a new evidentiary hearing if necessary."  *Kaiser v. Kaiser*, 259 N.C. App. 499, 511, 816 S.E.2d 223, 232 (2018) (citation omitted).  Any further proceedings should be limited to the determination of Husband's income and the resulting child support calculation based on that income;

---

[17] Local Rule 11.1.1 provides, in relevant part:

> 11.1. Affidavit Required. Because the legislature has adopted presumptive child support obligations based upon joint earnings of the parties, no affidavits other than the verification of pleadings shall be required at the time of filing in child support actions.  However, each party*, by the date of the hearing*, shall complete and exchange affidavits as follows:

> 11.1.1. Both parties shall complete an affidavit containing income information, forms for which shall be available in the office of the Clerk, and have it available for an exchange of information by the hearing date.

Fifth Judicial District Local Rules 11.1.1.

the remaining findings were not challenged on appeal and are undisturbed.

## V.    Conclusion

We affirm the equitable distribution and sanctions portions of the trial court's order.  But finding 35 in the child support section, addressing Husband's social security income and 401k withdrawals, is not supported by the evidence.  We therefore vacate that portion of the finding and remand.  On remand, the trial court shall hold an evidentiary hearing limited to the determination of Husband's income if either party requests one.  If neither party does, the court may, in its discretion, enter a new child support order based on the existing record or hold such a hearing on its own initiative.  In either case, the trial court shall enter an order establishing the child support obligation and directing the manner of payment.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judges TYSON and HAMPSON concur.